[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1016 
These consolidated appeals arise out of the State Banking Department's regulation of deferred-presentment transactions, more commonly referred to as "payday loans" because the maturity date of these short-term "loans" generally coincides with the borrower's next payday. The questions presented are whether the Alabama Small Loan Act, § 5-18-1 et seq., Ala. Code 1975, applies to deferred-presentment transactions and whether the trial court erred in holding that deferred-presentment transactions conducted in accordance with its consent order "shall be considered lawful."
On July 1, 1998, the supervisor of the Bureau of Loans at the State Banking Department began issuing cease and desist orders against businesses offering "loans" in the amount of $749 or less without a license. The orders were issued pursuant to the Alabama Small Loan Act. That same day, the Alabama Check Cashers Association ("ACCA"), along with individually named check cashers, instituted a declaratory-judgment action against the Banking Department and individually named employees of the Banking Department. In that action, the ACCA and the check cashers sought a judgment declaring that the Alabama Small Loan Act did not apply to the operations of the check cashers. The ACCA and the check cashers also sought a temporary injunction to prevent the Banking Department from enforcing the cease and desist orders.
The ACCA and the cheek cashers described their transactions in their complaint as follows:
 "3. Plaintiffs generally perform two types of check-cashing transactions. The first type of transaction is a simple `check cashing' transaction whereby the Plaintiff businesses accept a customer's personal or third party check [and cash] it for a fee without any specific agreement with the customer to withhold depositing it for a particular period of time, although the deposit may be delayed for the businesses own purposes or convenience. The fee is typically based on a percentage of the face amount of the check and may depend on the nature of the check. This type of `check cashing' transaction is not believed to be at issue in this case.
 "4. The second type of check cashing transaction is sometimes called a `deferred presentment' or a `delayed deposit' transaction. (Those terms are used interchangeably herein.) In . . . such a transaction, the Plaintiff businesses cashes the customer's check for a fee but, for the convenience of the customer and at the customer's request (which may or may not also be for the businesses' own purposes and convenience), agrees to hold the check for a limited period of time before depositing it. Typically deposit may be delayed for a period of two weeks and only rarely would it be delayed longer than 30 days. By utilizing this service, the customer *Page 1018 
may avoid often multiple nonsufficient funds check charges and other `service' charges which are actually or implicitly agreed to by a customer in the event he or she does not have available funds to cash the check at the time it is written or deposited and returned. In addition, the customer avoids delays and credit checks and the pledge of collateral to borrow funds. There may or may not be a separate fee, in addition to a check cashing fee, for this delayed deposit.
 "5. Among the different types of `deferred presentment' transactions are three broad categories which may be more particularly described as follows:
 "Number 1 — The `Flat Fee' Scenario:
 "Under the `Flat Fee' scenario, some businesses cash the customer's check but agree to delay deposit of the check until an agreed upon date for the customer's convenience. The fee charged for the transaction is the same fee as might be charged in a `check cashing' transaction, i.e., the customer pays a flat fee for the service irrespective of whether the deposit of the check is deferred to an agreed upon future date or not.
 "Number 2 — The `Service Charge' Scenario:
 "Under the `Service Charge' scenario, some businesses cash the customer's check but agree to delay deposit of the check until an agreed upon date for the customer's convenience. However, in addition to the `flat fee' which might be charged for a `check-cashing' transaction, the business also charges the customer an additional minimal service charge, e.g., $5.00 for delaying the deposit. This additional service charge usually does not vary over time or relate to the amount of the check; rather, it is a one-time service fee charged to cover additional administrative costs associated with such transactions.
 "Number 3 — The `Catalogue Sales' Scenario:
 "Under the `Catalogue Sales' scenario, some businesses are primarily engaged in catalogue sales, selling merchandise to a customer either directly from a catalogue or from the catalogue showroom floor. Customers can also purchase gift certificates from the provider for future redemption of items from the business' catalogue or catalogue showroom. If a customer either purchases merchandise from the catalogue or the showroom, the business will agree to cash a separate check and delay its deposit for the customer's convenience until an agreed upon date. No `additional' fee is charged for this check cashing service. Furthermore, the business does not charge deferral customers a higher price for the merchandise or gift certificates; rather, the customer pays the same price for the merchandise and gift certificates irrespective of whether he/she cashes a separate check in this manner.
 "With some variation, one or more of the Plaintiffs engage in one or more of these general types of `deferred presentment' transactions, and it is with respect to these types of transactions that they seek declaratory judgments. Plaintiffs have been conducting these types of transactions for as many as five (5) years without being regulated by the State Banking Department."
On October 9, 1998, the trial court entered a consent order, encompassing an agreement between the ACCA and the check cashers, on the one hand, and the Banking Department, on the other. The order provided: *Page 1019 
 "Pursuant to successful mediation conducted between the parties on September 24, 1998, and upon agreement of the parties to a stipulated order for an Injunction,
 "It is hereby ordered, adjudged and decreed by the Court that, during the pendency of this action, or until such final determination thereof, or until the effective date of any new legislation enacted by the Alabama Legislature regulating deferred presentment services, Plaintiffs, their officers, agents, servants, and employees shall conform then-deferred check presentment transactions as follows:
 "1. On or before November 3, 1998, the Alabama Check Cashers Association shall pay to the Banking Department of the State of Alabama a non-refundable, non-prorated sum of $500.00 per Plaintiff location in lieu of any licensing fee. This fee shall be valid until final determination of this action.
 "2. Plaintiffs who desire to enter into the pawn broking business during the pendency of this action must pay an additional licensing fee of $500.00.
 "3. Plaintiffs who also conduct other licensed activities, e.g., pawn broker or title pawn transactions, shall maintain separate business and financial records for each activity — one set of records for deferred presentment transactions and additional separate records for other licensed activities.
 "4. Plaintiffs shall not renew or otherwise consolidate a deferred presentment transaction with the proceeds of another deferred presentment transaction made by the same Plaintiff or affiliated Plaintiffs or other licensed activities (e.g., pawn broker or title pawn transactions). After the customer has redeemed the check in full, a Plaintiff has the same authority as any other Deferred Presentment Services Provider to enter into another agreement for deferred presentment services on another check.
 "5. (a) Plaintiffs may charge a fee to defray operational costs, including without limitation, investigating the checking account and copying required documents, photographing the person signing the check, securing the check and customer records in a safe, fire-proof place, maintaining records as required by this Order, maintaining required capital and liquidity, processing documenting, closing the transaction. The fee, when made and collected, shall not be deemed interest for any purposes of law.
 "(b) Deferred presentment transaction fees authorized by this Order shall not exceed the following, unless otherwise authorized by this Court:
 "(1.) For the service of cashing checks, without regard to whether Deferred Presentment is involved:
 "a. A fee, not in excess of three percent of the face amount of the check or draft if such check or draft is the payment of any kind of state public assistance or federal [s]ocial [s]ecurity benefit payable to the bearer of such check or draft;
 "b. A fee of 10 percent of the face amount of any personal check or money order; or
 "c. A fee, not to exceed five percent of the face amount of the check or draft in the case of all other checks.
 "(2.) In a deferred presentment transaction, which involves a personal check, an additional fee not to exceed six and sixty-seven one-hundredths percent of the face amount of the check.
 "6. Plaintiffs may not accept a check for the purpose of a deferred presentment *Page 1020 
transaction without receiving from the customer a written certification that the account upon which the check is drawn is legitimate and open.
 "7. Before a Plaintiff shall present for payment or deposit a check accepted by a Plaintiff, the check shall be endorsed with the actual name under which the Plaintiff is doing business.
 "8. Any agreement for deferred presentment of a check shall be in writing and signed by the maker of the check. The maker of a check shall have the right to redeem the check from the Plaintiff before the agreed date of deposit upon payment to the Plaintiff of the amount of the check. If a Plaintiff accepts a partial payment, the check may not be presented for deposit nor may the Plaintiff charge any additional fee. A Plaintiff shall not defer presentment of any personal check for less than five days nor more than 31 calendar days after the date the check is tendered to the Plaintiff.
 "9. A Plaintiff shall notify the district attorney for the circuit in which the check was received within five business days after being advised by the payer financial institution that a check or draft has been altered, forged, stolen, obtained through fraudulent or illegal means, negotiated without proper legal authority, or represents the proceeds of illegal activity. If a check or draft is returned to the Plaintiff by the payer financial institution for any of those reasons, the Plaintiff shall not release the check, draft, or money order without the consent of the district attorney or other investigating law enforcement authority.
 "10. A Plaintiff shall comply with all provisions of state and federal law regarding cash transactions and cash transaction reporting.
 "11. Plaintiffs shall provide each prospective customer, before consummation of the deferred presentment agreement, a written explanation, in clear, understandable language, of the fees to be charged by the Plaintiff, and the date on which the check will be deposited or presented by the Plaintiff. The consumer, prior to entering into a deferred payment presentment transaction, shall receive and acknowledge an accurate and complete notification and disclosure of the itemized and total amounts of all fees and other costs that will or potentially could be imposed as a result of such agreement.
 "12. Plaintiffs shall issue a copy of the written agreement to each person for whom they defer deposit of a check. The written agreement shall include the information described in paragraph 11 above.
 "13. If a check is returned to a Plaintiff from a payer financial institution due to insufficient funds, closed account, or a stop payment order, the Plaintiff shall have the right to all civil remedies allowed by law to collect the check and shall be entitled to recover the returned check fee authorized by Section 8-8-15, Code of Alabama 1975, court costs and an attorney's fee paid to an attorney who is not a salaried employee of the Plaintiff. The attorney fee may not exceed 30 percent of the face amount of the check. Plaintiffs shall not seek criminal remedies pursuant to Section 13A-9-13.1, Code of Alabama 1975, for checks returned due to insufficient funds. However, checks returned to Plaintiffs due to closed account or stop payment orders may be collected pursuant to Section 13A-9-13.1, Code of Alabama 1975.
 "14. No Plaintiff may alter or delete the date on any check accepted by the Plaintiff. No Plaintiff may accept an *Page 1021 
undated check or a check dated on a date other than the date on which the Plaintiff accepts the check.
 "15. No Plaintiff shall engage in unfair or deceptive acts, practices, or advertising in the conduct of the Plaintiff business.
 "16. Consistent with the nature of a deferred presentment transaction, no Plaintiff shall require a customer to provide security for the transaction or require the customer to provide a guaranty from another person.
 "17. Each Plaintiff shall pay all proceeds in cash for any check cashed.
 "18. Every Plaintiff shall conspicuously and continuously display a schedule of fees, charges, and penalties for all services provided by the Plaintiff.
 "19. No Plaintiff shall have more than one deferred presentment check outstanding at any time from any one customer. A deferred presentment check to any one customer shall not exceed five hundred dollars ($500).
 "20. For the purpose of determining compliance with this Order, the Supervisor may, at any reasonable time, cause an examination to be made at the Plaintiffs' place of business of the records and transactions of each Plaintiff to determine compliance with this Order. As cost of examination, the Plaintiff shall pay the Supervisor an examination fee equal to that provided by 5-2A-24, Code of Alabama 1975, which shall be collected and paid into the special fund, provided by 5-2A-20, Code of Alabama 1975, and used in the supervision and examination of licenses. Each Plaintiff shall preserve all relevant records during the pendency of this action.
 "In addition, the State Banking Department is hereby enjoined from enforcing the subject Cease and Desist Orders against the Plaintiffs during the pendency of this action and, further, shall provide a copy of this Order to the District Attorney of each affected county.
 "The parties further agree to continue in good faith to conduct discovery in accordance with the Court's Scheduling Order entered contemporaneously herewith.
 "If future legislation regulating deferred presentment services is enacted during the next regular session of the Alabama Legislature resolving the issues in this action, then, upon the effective date of said legislation, the parties agree to dismiss voluntarily this action with prejudice.
 "The Clerk is instructed to place this matter on the Court's administrative docket pending further order of the Court."
On November 23, 1998, customers who had obtained "payday loans" moved to intervene both as a matter of right and permissively. The customers sought (1) to withdraw the consent order; (2) to counterclaim for damages under the Alabama Small Loan Act and the Alabama Consumer Credit "Mini-Code," §5-19-1 et seq., Ala. Code 1975; and (3) to certify a plaintiff class of customers and a defendant class of check cashers. Following a hearing, the trial court partially granted the customers' motion to intervene on March 2, 1999. The customers' intervention was "granted for the limited purpose of determining the declaration of rights as to the legal issue of the applicability of the Alabama Small Loans Act to Plaintiffs check cashing transactions as outlined in the Plaintiffs complaint."
On April 19, 1999, the customers filed a motion for a judgment on the pleadings or, in the alternative, a motion for a summary judgment. On June 4, 1999, the Banking *Page 1022 
Department moved for a summary judgment.
In 1999, some of the check cashers moved to compel arbitration with the customers. The trial court denied the motions. This Court affirmed the trial court's judgment without an opinion. A B Check Cashing, Inc. v. Bess,824 So.2d 83 (Ala. 2001)(table).
On November 1, 2000, the Banking Department filed a motion for sanctions alleging violations of the consent order, or, in the alternative, leave to supplement the pleadings to include another type of "payday loan." This scenario involved "Phone Card Club" transactions, in which, for example, a customer signs an agreement to purchase a telephone calling card every two weeks for the next year for $25 per card. The customer is then given a "cash incentive" of $100. In two weeks, the customer will owe $125 (the amount of the cash incentive plus the cost of the telephone calling card), and, if that amount is not paid, the check casher is authorized to debit the customer's checking account[2] per the one-year agreement. If the customer is unable to pay the $125, he or she can pay an additional $25 and not be considered in default, or, if the customer defaults, he or she owes the $125 plus a $25 insufficient-fund fee. Neither the customers nor the check casher's employees were aware of the number of minutes on the telephone calling card. Although the customer was charged $25 for the calling card, the check casher purchased the card for $4. On November 27, 2000, the trial court granted the motion to supplement the pleadings with the "Phone Card Club" transactions.
The record indicates that at a hearing on August 9, 2001, the check cashers moved for a determination that operating in accordance with the consent order protected them from civil liability. On August 23, 2001, the Banking Department filed a "Renewed Motion for Summary Judgment."
On September 7, 2001, the trial court held a hearing on the pending motions. On June 21, 2002, the trial court entered an order stating:
 "This cause having come before the Court on final hearing, the same having been considered, it is hereby
 "Ordered, Adjudged and Decreed pending before the Court are motions for Summary Judgment, Motion to Stay and Motions for Class Certification. This case was originally filed in 1998 and involves that group of business activities collectively called `deferred presentment transactions.' Plaintiffs and Defendant presented a Consent Decree, which was adopted by the Court, effectively enjoining the State Banking Department's effort to enforce a Cease and Desist Order pending action to regulate the business by the Alabama Legislature. This case is ripe for Summary Judgment pursuant to Rule 56 of the Alabama Rules of Civil Procedure, as there are no genuine issues as to any material facts and the Court is presented with a purely legal question.
 "The sole question presented to the Court is whether the `deferred presentment transactions' are subject to the Alabama Small Loan Act, pursuant to Sec. 15-18-1
et seq. Code of Alabama, 1975. These transactions involve different categories, but essentially require a customer's check to be cashed for which the customer agrees to pay a fee, purchase a gift certificate or purchase phone cards. Regardless of the category, *Page 1023 
the legal question is the same. `Are these transactions subject to the Small Loan Act?' The answer to the question is No.
 "A history of the Small Loan Act pointing out the need for regulation is found in the opinion of Justice Harwood:
 "We judicially know that prior to the Alabama Small Loan Act in 1959, the small loan operator went unrestrained by an effective statutory regulation. Those whose chief motivation was greed preyed upon the ignorant, the uninformed, and the necessitous.
 "`For decades concerned citizens and organizations made strenuous but futile efforts to have enacted legislation looking toward elimination of this evil. For some years, it was one of the main projects of the Junior Bar Section of the Alabama Bar. The efforts of all of these interested combinations eventually came to fruition in the passage of the Small Loan Act.' New Finance Ltd. v. Ellis, [284 Ala. 374, 375,] 225 So.2d 784[, 785 (1969)].
 "This is not the first time the State Banking Department has come to court seeking to have transactions included within the Small Loan Act. While the Department's actions may be in the best interest of the public, they are in the wrong forum. The State Banking Department sought to have automobile title loans classified as transactions within the Small Loan Act rather than transactions under the Alabama Pawnshop Act. Floyd v. Title Exchange and Pawn, 620 So.2d 576 (Ala. 1993). `The distinction is significant because the Small Loan Act provides interest of two or three percent per month, depending on the amount of the unpaid balance, Sec. 5-18-15(a), whereas the Pawnshop Act permits charge of twenty-five percent of the principal amount per month, Sec. 5-19A-7(a).' Floyd at 576 n. 4. The Supreme Court rejected the effort to expand a definition the Legislature had specifically excluded.
 "The Small Loan Act does not define the term `loan.' The State urges the Court to adopt the definition of loan found in Black's Law Dictionary 936 (6th ed.1990), `delivery by one party and receipt by another party a sum of money upon agreement, express or implied, to repay it with or without interest.' However, this definition fails to completely address the types of transactions addressed herein.
 "When the Supreme Court was asked to approve language not included under the Alabama Small Loan Act (attorney fees as collection costs), the Court declined, holding, `The language of the Act discloses a studied intent to make it strictly inclusive as to permissible charges to be assigned against the borrower. If the purposes of the Act are to be fulfilled, it should not be eroded by indirection.' New Finance Ltd. v. Ellis, [284 Ala. 374,] 225 So.2d 784.
 "The Legislature has shown approval for different treatment and interest rate charges for transactions other than those covered under the Small Loan Act. See Alabama Pawnshop Act, Sec. 15-19A-1 et seq. Code of Alabama, 1975, and The Alabama Consumer Credit Act, [§ ] 5-19-1 et seq. Code of Alabama
1975, Alabama Credit Card Act, [§ ] 5-20-1 et seq. Code of Alabama, 1975.
 "In all cases there are some guiding principles the Court is bound to follow. The clearly expressed intention of the Legislature must be given effect, and there is no room for construction. James v. Todd, 103 So.2d 19 [(1957)]. The powers of government of this State are divided into three distinct departments, legislative, executive and judicial. *Page 1024 
Ala. Const. 1901 Sec. 42. `The judicial shall never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men.' Ala. Const. 1901 Sec. 43. It is not the duty of the court to question the wisdom, or lack thereof, used by the Legislature in enacting laws of this state. Ex parte T.D.T., 745 So.2d 899, 904 (Ala. 1999).
 "None of the categories of `deferred presentment transactions' outlined above are included within the definitions contained within the Small Loan Act. The State Banking Department is attempting to have the courts do that which the Legislature has declined. A strict construction of the Alabama Small Loan Act does not include coverage for such transactions.
 "The Legislature has had the opportunity over the years to expand the Small Loan Act to include such transactions or otherwise pass regulations, but has chosen otherwise. For the Court to now expand the definitions and transactions would be judicial activism and the Court must resist the request. `The supervisor of the Bureau of Loans in his brief and at oral argument insisted strongly that Title Exchange's business practice should be regulated under the provisions of Alabama's Small Loan Act. If our interpretation of the Alabama Pawnshop Act is incorrect, the legislature, of course, can easily amend the Act, so that there will be no doubt in the mind of the lender or the regulator as to what the legislature intended.' Floyd at 579. As is the case here, if the Court's interpretation of the Act is incorrect, the Legislature can easily amend the Act. Simply put, this matter is for the Legislature and not the Courts.
 "Therefore, The State Banking Department is permanently enjoined from enforcing the Cease and Desist Orders pursuant to the Alabama Small Loan Act. Those that have conducted business transactions pursuant to the Consent [Order] shall be considered lawful. All other Motions are rendered moot."
On June 27, 2002, the trial court restored the consent order pending any appeal, pursuant to Rule 62(c), Ala. R. Civ. P. Both the Banking Department and the customers-interveners filed timely notices of appeal.[3] The legislature then enacted the Deferred Presentment Services Act, § 5-18A-1 et seq., Ala. Code 1975, effective June 20, 2003. On July 31, 2003, Express Check Services, Inc., an individually named plaintiff/check casher, filed a motion with this Court asking for leave to submit the Deferred Presentment Services Act as supplemental authority. In that motion, Express Check argued that because the legislature saw the need to address those transactions with legislation, by implication, neither the Small Loan Act nor any other act governed deferred-presentment transactions before the effective date of the Deferred Presentment Services Act in 2003. Express Check contended that because the Small Loan Act did not apply, any transactions conducted pursuant to the consent order were legal.
In response to the motion, the Banking Department and the customers denied that the passage of the Deferred Presentment Services Act implied that the deferred-presentment transactions were not previously regulated by the Small Loan Act. Specifically, they cited § 22 of the Deferred Presentment Services Act, codified at § 5-18A-22, which provides: *Page 1025 
 "The provisions of this chapter shall not be construed to take away or negatively impact the customers' claims in pending lawsuits against persons operating deferred presentment services on or before June 20, 2003."
The enactment of the Deferred Presentment Services Act in 2003 does not mean that there were no laws regulating deferred-presentment transactions before them. Clearly, it was the intent of the legislature in 2003 to adopt a statute to address the specific nature of deferred-presentment transactions, but that fact does not imply that the provisions of the Small Loan Act were inapplicable to those deferred-presentment transactions that occurred before June 20, 2003.
 "`It is the general rule that where the general statute standing alone would include the same matter as the special act, and thus conflict with it, the special act will be considered as an exception to the general statute whether it was passed before or after such general enactment. Where the special statute is later it will be regarded as an exception to or qualification to the prior general one; and where the general act is later the special statute will be considered as remaining an exception to its terms unless it is repealed in general words or by necessary implication.'"
2B Norman J. Singer, Sutherland on Statutory Construction
§ 51.05 (6th ed.2000) (quoting People v. Breyer, 139 Cal. App. 547, 550, 34 P.2d 1065, 1066 (1934)).
On August 19, 2004, Express Check Services and Elizabeth Bess, one of the customers, filed in this Court a joint motion to dismiss Express Check Services as a plaintiff. The trial court, however, concluded in its final order that the class-certification motion was moot; therefore, Bess is not representing any other customers in this action. Nothing in this joint motion indicates the reason for Express Check Services' dismissal and nothing indicates that the motion was served on counsel for the Banking Department and counsel for the other customers. There is no way for this Court to determine whether Express Check Services has customers other than Bess who are involved in this action and, if so, whether counsel for those customers would consent to the dismissal of Express Check Services. Accordingly, we deny the motion to dismiss Express Check Services.
The Banking Department and the customers ask this Court to address the issue whether advancing money on a customer's personal check, which the check casher does not deposit to a bank until the customer's next payday, is a loan subject to, and violative of, the Alabama Small Loan Act and, if so, whether such illegal payday loan transactions conducted pursuant to the consent order are legitimized.
These appeals are before this Court on the trial court's final order in this declaratory-judgment action entered pursuant to the Banking Department's and the customers' summary-judgment motions and the check cashers' motion for a determination that conducting their transactions in accordance with the consent order protected them from civil liability. "Our review of a summary judgment is de novo." Crutcher v.Wendy's of North Alabama, Inc., 857 So.2d 82, 85
(Ala. 2003). "`The nature of our review of the legal conclusions of a trial court is de novo.'" House v.Jefferson State Cmty. Coll., 907 So.2d 424, 427
(Ala. 2005) (quoting Omega Leasing Corp. v. Movie Gallery,Inc., 859 So.2d 421, 422 (Ala. 2003)). The material facts are not in dispute. The pleadings and the materials submitted in support of the summary-judgment motions set out the facts surrounding the nature of the deferred-presentment transactions between the check cashers and the customers. *Page 1026 
The trial court was required to answer a question of law involving these undisputed facts. In other words, the trial court was required to determine whether these deferred-presentment transactions violated the Alabama Small Loan Act and, if so, the legal consequences to the check cashers of acting in accordance with the consent order.
 The Alabama Small Loan Act
The first Model Uniform Small Loan Act was drafted in 1916. Alabama adopted a version of the Uniform Small Loan Act in 1959. The Banking Department argues that "payday loans" are disguised as check-cashing transactions in order to evade the Alabama Small Loan Act. Although the term "loan" is not defined in the Small Loan Act, the word has a commonly understood meaning — to advance money for a period of time with an obligation to repay, with or without interest. The Banking Department contends that its position is consistent with other state consumer-finance regulations and that the federal government has already amended its consumer-finance regulations to include payday loans as credit transactions subject to the Truth-In-Lending Act ("TILA"), 15 U.S.C. § 1601 et seq. Courts in other jurisdictions have found payday loans to be subject to consumer-finance statutes. The Banking Department also contends that the consent order did not provide a "safe harbor" from liability for payday loans that violate the Alabama Small Loan Act.
The customers argue that the trial court erred in ruling that it would be a violation of the separation-of-powers doctrine for it to hold that "payday loans" fall within the scope of the Alabama Small Loan Act. The customers contend that the transactions are subterfuges to evade the application of the Small Loan Act. The customers note that the trial court did not hold that the transactions were not loans, rather the court held that it would be judicial activism to include the transactions within the meaning of the Small Loan Act when the term "loan" was not defined in the Small Loan Act.
In determining whether the deferred-presentment transactions are subject to the Small Loan Act, we note the following rule of statutory construction:
 "`The fundamental rule of statutory construction is to ascertain and give effect to the intent of the legislature in enacting the statute. Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says. If the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect.'"
Ex parte Master Boat Builders, Inc., 779 So.2d 192,196 (Ala. 2000) (quoting IMED Corp. v. Systems Eng'gAssocs. Corp., 602 So.2d 344, 346 (Ala. 1992)).
The Alabama Small Loan Act is a remedial statute,Echols v. Star Loan Co., 290 Ala. 76, 274 So.2d 51
(1973), and should be liberally construed to effect its purpose and to advance the remedy for which it was enacted. We are guided by the legislature's findings of fact and declaration of intent set out in the Alabama Small Loan Act:
 "(a) The Legislature finds as facts and determines that:
 "(1) There exists among citizens of this state a widespread demand for small loans. The scope and intensity of this demand have been increased progressively by many social and economic forces; *Page 1027 
 "(2) The expense of making and collecting small loans, which are usually made on comparatively unsubstantial security to wage earners, salaried employees and other persons of relatively low incomes, is necessarily high in relation to the amounts lent;
 "(3) Such loans cannot be made profitably under the limitations imposed by existing laws relating to interest and usury. These limitations have tended to exclude lawful enterprises from the small loan field. Since the demand for small loans cannot be legislated out of existence, many small borrowers have been left to the mercy of those willing to bear the opprobrium and risk the penalties of usury for a large profit;
 "(4) Interest charges are often disguised by the use of subterfuges to evade the usury law. These subterfuges are so complicated and technical that the usual borrower of small sums is defenseless even if he is aware of the usurious nature of the transaction and of his legal rights;
 "(5) As a result, borrowers of small sums are being exploited to the injury of the borrower, his dependents and the general public. Charges are generally exorbitant in relation to those necessary to the conduct of a legitimate small loan business, trickery and fraud are common and oppressive collection practices are prevalent; and
 "(6) These evils characterize and distinguish loans of $749.00 or less. Legislation to control this class of loans is necessary to protect the public welfare.
 "(b) It is the intent of the Legislature in enacting this law to bring under public supervision those engaged in the business of making such loans, to eliminate practices that facilitate abuse of borrowers, to establish a system of regulation for the purpose of insuring honest and efficient small loan service and of stimulating competitive reductions in charges, to allow lenders who meet the conditions of this chapter a rate of charge sufficiently high to permit a business profit and to provide the administrative machinery necessary for effective enforcement."
§ 15-18-2, Ala. Code 1975.
This Court, in interpreting the Alabama Small Loan Act, has focused on the purpose behind the Act. In New Finance Ltd.v. Ellis, 284 Ala. 374, 225 So.2d 784 (1969), the issue was whether the Alabama Small Loan Act prohibited a licensee under the Act from incorporating into a loan agreement a provision that the borrower will pay all expenses of collecting the debt, including a reasonable attorney fee. In addition to charging an interest rate, the Small Loan Act expressly provided for an insurance and a recording charge. The Court stated:
 "We judicially know that prior to the Alabama Small Loan Act in 1959, the small loan operator went unrestrained by an effective statutory regulation. Those whose chief motivation was greed preyed upon the ignorant, the uninformed, and the necessitous.
 "For decades concerned citizens and organizations made strenuous but futile efforts to have enacted legislation looking toward elimination of this evil. For some years, it was one of the main projects of the Junior Bar Section of the Alabama Bar. The efforts of all of these interested combinations eventually came to fruition in the passage of the Small Loan Law.
 "The amounts of the loans made by the small loan operator is often small, $10.00, $20.00, $50.00, etc. An interest rate of 8% per annum would not be *Page 1028 
economically feasible when considered in the light of office expenses, bookkeeping, and collection costs, plus the fact that many of those seeking small loans are poor credit risks.
 "The thinking of those experts in the field of small loans has been that the interest rate on such loans should be sufficiently high to enable a lender to have a fair return on his operations, and at the same time effectively limit the charges permitted to be imposed by the lender. The increase in the permissible rate of interest should be sufficiently high to take care of the costs of the lender's operations, including the credit risks involved. For this quid, a quo of higher charges in the form of full protection should be thrown around the borrower. See Euel Screws, Report of Committee on Small Loans Studies, Junior Bar Section, 20 Alabama Lawyer. It was the almost unanimous conclusion of virtually all of the studies made in this field through the years that the two factors above (interest rate, and borrower protection) could best be obtained by a realistic interest rate on small loans, and a strict and fixed limitation on all permissible charges additional to such higher interest."
284 Ala. at 375-76, 225 So.2d at 784-85. The Court concluded that the legislature's intent in fixing the interest at a higher rate than other loans that the lender should pay the collection costs: "[T]he clear and unambiguous language of the Act in reference to additional permissible charges, necessarily dictates the conclusion that the inclusion of a provision for payment of attorney's fees in case of default is prohibited by the explicit terms of the Act." 284 Ala. at 377, 225 So.2d at 787.
The applicability of the Alabama Small Loan Act has been addressed in cases involving transactions other than deferredpresentment transactions. Pendleton v. AmericanTitle Brokers, Inc., 754 F.Supp. 860 (S.D.Ala.1991), involved a transaction in which the customer pledged title to an automobile as collateral for a loan, and the lender then leased the automobile back to the customer. The customer argued that the lender violated TILA and the Alabama Small Loan Act. With regard to the statelaw claim, the lender argued that he had not violated the Alabama Small Loan Act because he was in the pawnbroking business, which § 5-18-4(b) expressly excludes from the provisions of the Act. Interpreting the Alabama Small Loan Act, the federal district court concluded that because the lender did not retain possession of the collateral as security for its loans, but rather made its money by leasing the customer their own automobile, the lender was not in the traditional practice of pawnbroking in which the pawnbroker retains possession of the collateral.
In Floyd v. Title Exchange Pawn of Anniston,Inc., 620 So.2d 576 (Ala. 1993), the lender was in the business of pawning automobile certificates of title. The sole issue on appeal was whether a person can pawn an automobile certificate of title and retain possession of the automobile. The answer depended on whether the legislature intended an automobile certificate of title to be "tangible personal property" within the meaning of the Alabama Pawnshop Act. The supervisor of the Bureau of Loans argued that the pawnbroker was making small loans without a license and was charging excessive rates of interest, in violation of the Alabama Small Loan Act. Floyd held that money-lending transactions involving the transfer of automobile certificates of title for the purpose of giving security are "pawn" transactions and not "small loan" transactions governed by the provisions of the Alabama Small Loan Act. *Page 1029 
Courts in Alabama have also addressed deferred-presentment transactions in the context of arbitration and class actions.[4]
In Alabama Catalog Sales v. Harris,794 So.2d 312 (Ala. 2000), the plaintiff brought a class action against catalogue retailers, alleging that by making illegal "payday loans," charging usurious interest, and operating without a license the retailers had violated the Alabama Small Loan Act. The retailers moved to compel arbitration. The plaintiff argued that her contracts with the retailers were void because of illegality and thus that the arbitration clauses in those contracts were also void. The retailers argued that the contracts were not void and that the arbitrator, not the trial court, should decide the question of the legality of the contracts. The trial court denied the motions to compel. This Court stated:
 "The defendants argue that Harris failed to present substantial evidence of illegality. . . . We conclude that Harris presented sufficient evidence indicating that the contracts are illegal, and, therefore, are void and unenforceable. Likewise, Harris argues, the unenforceability of the contracts extends to the agreements to arbitrate. We agree. Thus, if the contracts are void and unenforceable, no claims arising out of or relating to the contracts are subject to arbitration. . . .
 "The record contains sufficient evidence indicating that the underlying contracts violate the Alabama Small Loan Act. . . ."
794 So.2d at 316-17.
In Ex parte Speedee Cash of Alabama, Inc.,806 So.2d 389 (Ala. 2001), Speedee Cash requested mandamus relief to stay a class action filed in Chilton County in 1999, after the complaint in the present action was filed in Montgomery County. The plaintiffs claimed violations of the Alabama Small Loan Act. A plurality of this Court concluded that the stay should be granted because the defendant classes in the Chilton County action and in this action were the same or at least involved a substantial degree of overlap and one lender was included in both defendant classes. Speedee Cash is one of the appellees in the present appeals.
In Alternative Financial Solutions, LLC v. Colburn,821 So.2d 981 (Ala. 2001), the consumers sued Alternative Financial *Page 1030 
Solutions ("AFS") and Money Service Centers ("MSC") in Tuscaloosa and Madison Counties, respectively, arguing that AFS and MSC had violated the Alabama Small Loan Act. AFS and MSC moved to enforce arbitration provisions in their contracts with the consumers. Both trial courts denied the motions; AFS and MSC appealed separately; and the appeals were consolidated. This Court held that the transactions did not substantially affect interstate commerce and affirmed the trial courts' orders denying arbitration. AFS and MSC intervened in the present case and have been operating in accordance with the consent order since 1999.
In Voyager Life Insurance Co. v. Hughes,841 So.2d 1216 (Ala. 2001), the plaintiffs were sold credit-disability insurance in conjunction with consumer loans. The loan agreement and insurance policy both contained an arbitration clause. The trial court determined that the defendants had waived their right to arbitration as to all the plaintiffs. This Court held that the defendants had substantially invoked the litigation process as to certain plaintiffs but reversed as to other plaintiffs who were added later in the litigation. The Court made no determination as to whether the Alabama Small Loan Act or the Mini-Code applied to the loan agreements or the policies because that argument was not raised at the trial court level.
Bess v. Check Express, 294 F.3d 1298 (11th Cir.2002), involved a class action brought by customers against checkcashing companies, alleging violations of state and federal law arising out of deferred-presentment transactions. The customers argued that the transactions were small loans governed by the Alabama Small Loan Act and that the check-cashing companies had violated the Act by making loans without the requisite license and at usurious rates of interest. One of the named plaintiff/customers, Luna Colburn, had signed an arbitration agreement in connection with her transaction. The check-cashing companies sought to compel arbitration. Colburn argued that the arbitration agreement was unenforceable because, she argued, the underlying deferred-presentment transaction violated the Alabama Small Loan Act and was thus illegal. The United States Court of Appeals for the Eleventh Circuit concluded that because "allegations of illegality go to the deferred payment transactions generally, and not to the arbitration agreement specifically," an arbitrator and not a federal court should determine whether the underlying transactions are illegal and void. 294 F.3d at 1305.[5]
In 1994, Kenneth McCartha, the acting superintendent of banks, requested an opinion of the attorney general as to whether deferred-presentment transactions were subject to the Alabama Small Loan Act. The attorney general stated that they were. The attorney general opinion stated:
 "[I]t is the opinion of this office that the holding of the checks . . . by a check-cashing company is really a lending function. Check-cashing companies are making loans when they charge a fee and agree to hold the check or defer presentment of the check until sufficient funds are in the customer's account. Thus, the transaction . . . is governed by the Alabama Small Loan Act, Section 15-18-1, et seq., and the Mini-Code, Section 15-19-1, et seq., Code of Alabama *Page 1031 
1975, and is subject to the Truth in Lending disclosure requirements."
Ala. Op. Att'y Gen. 210 (July 7, 1994). "While an opinion of the attorney general is not binding, it can constitute persuasive authority." Alabama-TennesseeNatural Gas Co. v. Southern Natural Gas Co.,694 So.2d 1344, 1346 (Ala. 1997).
Although this is the first case in Alabama to address the laws applicable to deferred-presentment transactions in other than the context of arbitration and class actions, other jurisdictions have addressed such transactions in light of their consumer statutes. One of the first cases we have found addressing payday loans is Commonwealth v. Bar D.Financial Services, Inc., (Va.Cir.Ct. March 21, 1994), a decision by a circuit court in Virginia. The issue in BarD was whether the transactions constituted loans in violation of the Virginia Consumer Finance Act, § 6.1-244 et seq., Va.Code.[6] The customer testified that a typical transaction would involve the customer's writing a $100 post-dated check to the defendant with both the customer and the defendant having knowledge that the funds in the customer's checking account at the time the check was issued were insufficient. The defendant would pay the customer $83 in cash and agree to defer presentment of the check to a later date, generally corresponding to the customer's next payday. The defendant argued that it was buying checks at a discount rather than extending credit. The circuit court, applying the definition of "loan" found in Black's Law Dictionary,
concluded that the transactions were loans subject to the Virginia Consumer Finance Act.
In Hamilton v. York, 987 F.Supp. 953 (E.D.Ky.1997), customers of a checkcashing company sued the company, alleging violations of Kentucky's Usury Statute and Consumer Loan Act and TILA, among others. The company moved to dismiss, arguing that it was charging not interest but only service fees for cashing checks and that such activity was permissible under the checkcashing provisions of the Kentucky statute. The customers would give the company a check in exchange for cash, and the company would hold the check for two weeks before presenting it for payment or before requiring the customers to "pick up" the check by paying the face amount. The fee for holding the check for two weeks was 20 percent of the sum advanced in cash, which amounted to an annual percentage rate of 520 percent. The federal court, analyzing the transaction, quoted Hurt v.Crystal Ice Cold Storage Co., 215 Ky. 739,286 S.W. 1055, 1056-57 (1926):
 "`The cupidity of lenders, and the willingness of borrowers to concede whatever may be demanded or to promise whatever may be exacted in order to obtain temporary relief from financial embarrassment, as would naturally be expected, have resulted in a great variety of devices to evade the usury laws; and to frustrate such evasions the courts have been compelled to look beyond the form of the transaction to its substance, and they have laid it down as an inflexible rule that the mere form is immaterial, but that it is the substance which must be considered. No case is to be judged by what the parties appear to be or represent themselves to be doing, but by the transaction as disclosed by the whole evidence; and, if from that it is in substance a receiving or contracting for the receiving of usurious interest for a *Page 1032 
loan or forbearance of money the parties are subject to the statutory consequences, no matter what device they may have employed to conceal the true character of their dealings.'"
987 F.Supp. at 955-56. The federal court, relying on the definition of "loan" found in Black's Law Dictionary,
concluded that the transactions were short-term loans and not service fees. The company also argued that the checkcashing statutes encompassed short-term loans. The court noted that if the company's interpretation was correct, then the company would not have to stop with short-term loans; they could make long-term loans so long as they did so under the guise of cashing a check. The court denied the motion to dismiss, finding that the customers' complaint was sufficient to state a claim for relief.
In 1998, the Kentucky Legislature amended its statutes to expressly address deferred-presentment transactions. In 1999, the Supreme Court of Kentucky answered a certified question from a federal district court regarding payday loans. The checkcashing company argued that its payday loans were subject to the traditional checkcashing statute, Ky.Rev.Stat. § 368, and not subject to Kentucky's Usury Statute, Ky.Rev.Stat. Chapter 360. White v. Check Holders,Inc., 996 S.W.2d 496 (Ky. 1999). The question to be answered was:
 "When a check cashing company licensed under KRS 368 et seq. accepts and defers deposit on a check pursuant to an agreement with the maker of the check, is the service fee charged by the check cashing company a `service fee' and not `interest' under KRS 368.100(2), or is the fee `interest' which is subject to the usury laws and disclosure provisions in KRS Chapter 360?"
996 S.W.2d at 497. The Kentucky Court concluded that the statute allowing checkcashing businesses to charge fees without implicating the usury laws did not encompass fees for deferred-presentment transactions.
In Watson v. State, 235 Ga.App. 381, 509 S.E.2d 87
(1998), the defendants were convicted of violating the Georgia Racketeer Influenced Corrupt Organizations Act ("RICO"), Ga. Code Ann. § 16-14-1 et seq., stemming from their joint operation of a pawnshop and a check-cashing business. Customers would obtain a cash loan and write a check to the pawnshop for the full amount of the loan plus a 20 percent fee, which was classified as 1 percent interest and 19 percent "storage fee." The customer's check was left as collateral for the loan along with an item of nominal value, such as a jar of dirt or a pocket lighter, which were deemed pledged goods pursuant to the regulatory scheme applicable to pawnbrokers in Georgia. If the loans were not repaid or renewed, the defendant would then prosecute the customer. The Court of Appeals of Georgia affirmed the defendants' convictions under RICO for making small loans "thinly disguised as `pawns.'" 235 Ga.App. at 385, 509 S.E.2d at 91.
The federal court in Cashback Catalog Sales, Inc. v.Price, 102 F.Supp.2d 1375 (S.D.Ga.2000), denied the checkcashing company's summary-judgment motion. The customer claimed that the company had violated Georgia's usury statute, TILA, and federal racketeering laws. The court held that fact issues precluded a summary judgment. The court, in analyzing the transaction, concluded that a reasonable trier of fact could find the sale of gift certificates for a merchandise catalogue made in conjunction with payday loans amounted to illegal loans where the customer stated that he was never given a catalogue from which to order and was never told how to order from the catalogue. *Page 1033 
Also, the checkcashing company advertised its services in the telephone directory under "loans" despite stating on its contracts that "[w]e do not make loans, nor do we charge interest." 102 F.Supp.2d at 1377.
The Supreme Court of Indiana in Livingston v. Fast CashUSA, Inc., 753 N.E.2d 572 (Ind. 2001), answered a certified question of Indiana law arising out of numerous cases pending in the federal courts. In Indiana, the interest rate on small loans is capped at 36 percent per year under the Indiana Uniform Consumer Credit Code ("IUCCC"). The IUCCC also allows lenders to charge a minimum loan finance charge of $33. The parties in the federal cases agreed that a 15-day loan of $200 with a minimum loan finance charge of $33 represents an annual percentage rate of 402 percent. Reading the two provisions of the IUCCC together, the lenders contended that they were entitled to receive from a borrower a minimum loan finance charge in the amount of $33 even if that amount exceeds the amount that would result from the imposition of the maximum annual percentage rate of 36 percent. The Indiana Supreme Court concluded that the lenders' interpretation — "allowing a minimum finance charge of $33 for a loan that otherwise would generate what amounts to pennies in interest" — was inconsistent with the purposes and policies of the IUCCC and created "an absurd result which the legislature could not have intended when the statute was enacted or when the various amendments were adopted." 753 N.E.2d at 577.
In Betts v. Ace Cash Express, Inc., 827 So.2d 294
(Fla.Dist.Ct.App. 2002), customers of a checkcashing business brought a class action against the business, alleging that its practices violated Florida's usury laws. The Fifth District Court of Appeals of Florida ultimately held that the deferred-presentment transactions did not constitute loans. The court noted that in 1995 the Florida Check Cashiers Association ("FCCA") requested an opinion from the Florida Banking Department, which opined that the Money Transmitters' Code, Fla. Stat. ch. 560, enacted in 1994, did not expressly prohibit deferred-presentment transactions, and in 1997, the Florida Banking Department issued rules expressly approving deferred-presentment transactions, subject to certain restrictions. The court also noted that in 2001, the Florida Legislature had amended Chapter 560 specifically to address deferred-presentment transactions. The court stated:
 "After considering the Department's advisory opinion solicited by the FCCA in advance of any deferred presentment transactions between the Plaintiffs and the Defendants, the subsequent authorization of the practice by the Florida Legislature, and the absence of any prohibition against the practice in the interim we disagree with the Plaintiffs' characterization of the initial transaction as a loan."
827 So.2d at 297. However, the Court of Appeals for the Fourth District in Betts v. McKenzie Check Advance ofFlorida, LLC, 879 So.2d 667 (Fla.Dist.Ct.App. 2004), held that deferred-presentment transactions violated Florida's usury laws. In McKenzie Check Advance, the same plaintiff sued another checkcashing company with whom she had transacted business, alleging that the company's deferred-presentment practices violated Florida's usury laws. The court stated:
 "For purposes of the analysis, the characterization of the transactions is important. There is no question that what takes place is something more than simple check cashing. In a deferred presentment transaction, the customer *Page 1034 
is advanced money in exchange for a check which the lender agrees not to immediately cash. In exchange for agreeing to defer presentment of the check, the lender exacts a fee. As Betts argues in this case, one might wonder why anyone would utilize the services of a `check casher' and pay for what he or she could otherwise obtain for free at a bank. Clearly, it is because the customer does not have the funds readily available to honor the check. Thus, there can be no question that what takes place is essentially an advance of money or a short-term loan. See Party Yards, Inc. v. Templeton, 751 So.2d 121, 122
(Fla. 5th DCA 2000) ('In usury cases, courts look to substance over form because the purpose of usury statute is to protect the needy borrower by penalizing the unconscionable lender.')."
879 So.2d at 672. The District Court for the Fourth District concluded that the Florida Banking Department had exceeded its authority in 1997 by approving deferred-presentment transactions, and the court held that such transactions occurring pre-2001 (the date the Florida Legislature addressed deferred-presentment transactions) were subject to Florida's usury laws. The Florida Supreme Court has granted certiorari review in McKenzie. McKenzie Check Advance of Florida, LLCv. Betts, 904 So.2d 431 (Fla. 2005)(table).
Because the Alabama Small Loan Act is a remedial statute, we must interpret it to promote, rather than to frustrate, its objectives. The mischief sought to be remedied by the Alabama Small Loan Act is predatory lending schemes practiced upon the financially strapped consumer who lacks access to mainstream banking institutions. Section 5-18-4(c) provides:
 "(c) Evasions. The provisions of subsection (a) of the section [requiring a small-loan license] shall apply to any person who seeks to evade its application by any device, subterfuge or pretense whatsoever including, but not thereby limiting the generality of the foregoing: the loan, forbearance, use of sale of credit (as guarantor, surety, endorser, comaker or otherwise), money, insurance, goods or things in action; the use of collateral or related sales or purchases of goods or services or agreements to sell or purchase, whether real or pretended; and, receiving or charging compensation for goods or services, whether or not sold, delivered or provided and the real or pretended negotiation, arrangement or procurement of a loan through any use of activity of a third person, whether real or fictitious."
Although the legislature did not specifically address deferred-presentment transactions when it adopted the Alabama Small Loan Act in 1959, it clearly contemplated "subterfuges" and "evasions" used to attempt to avoid the protections afforded consumers under that Act.
The trial court correctly points out that the term "loan" is not defined in the Alabama Small Loan Act.[7]
A statute, however, is not unconstitutionally vague because the legislature did not define all the words or terms used in the statute, see, e.g., Ex parte City of Orange Beach Bd. ofAdjustment, 833 So.2d 51 (Ala. 2002) (failure to adequately define "structurally unsound" and "dilapidated" in a zoning ordinance did not make the ordinance void for vagueness), nor is it *Page 1035 
subverting the intent of the legislature to apply the plain, ordinary, and commonly understood meaning of a word, see, e.g.,Ex parte Etowah County Bd. of Edue, 584 So.2d 528, 530
(Ala. 1991)("It is . . . well accepted that this Court[, in interpreting a statute,] will give words used in a statute their `natural, plain, ordinary, and commonly understood meaning.'"). "`[W]hen a term is not defined in a statute, the commonly accepted definition of the term should be applied.'"Ex parte Gadsden Reg'l Med. Ctr., 904 So.2d 234, 236
(Ala. 2004) (quoting Bean Dredging, L.L.C. v. Alabama Dep'tof Revenue, 855 So.2d 513, 517 (Ala. 2003)).
This is not the first time this Court has reviewed an undefined term in a consumer-protection statute. InGibbs-Hargrave Shoe Co. v. Peek, 212 Ala. 633, 634,103 So. 672, 673 (1925), the issue focused on the meaning of the word "note" in a local money-lenders act applying to Jefferson, Walker, Morgan, and Etowah Counties, where the question raised was "whether the act covers a loan secured or evidenced by the promissory note of the borrower." The Peek Court stated:
 "The act is aimed at the business of that class of money brokers or lenders commonly known as `loan sharks,' whose favorite waters are the habitat of needy and untutored wage-earners.
 "The language of the statute indicates a studied intent to make it broadly inclusive to prevent evasion, and become effective as a police measure to suppress the evil. In keeping with this purpose, we hold that the word `note,' as used in the title and body of the act, has its usual meaning and includes promissory notes given as security or evidence of the debt. The case here furnishes a fair illustration of the reason for general terms. The plaintiff speaks of the papers signed by him as notes, but it is clear enough they were assignments of his wages as security for loans in fact, but having a concluding clause, declaring the transaction an `absolute purchase' of wages, and disclaiming a loan; this, perhaps, to give the transaction such form as to bring it within the rule of Max J. Winkler Brokerage Co. v. Darby, 167 Ala. 223, 52 So. 23 [(1910) ].
 "The record discloses the carrying on of such business in spite of the statute, the lender charging and collecting, for the use of the money, 20 per cent, of the amount of the loan at the end of every two weeks, or, as found by the trial court, at the rate of 520 per cent, per annum.
 "In construing a statute framed to prevent an abuse like this, we seek to give its language such effect as will best express the intent of the lawmakers. Cooledge v. Collum, 211 Ala. 203, 100 So. 143 [(1924) ]; Alabama Brokerage Co. v. Boston, 18 Ala.App. 495, 93 So. 289 [(1922) ]; Ex parte Alabama Brokerage Co., 208 Ala. 242, 94 So. 87 [ (1922)]; In re Home Discount Co. (D.C.) 147 F. 538, 544 [(1906) ]."
212 Ala. at 634-35, 103 So. at 673-74 (emphasis added).
Black's Law Dictionary 936 (6th ed.1990) defines "loan" as "delivery by one party and receipt by another party of a sum of money upon agreement, express or implied, to repay it with or without interest." The flat-fee, service-charge, catalogue-sales, and phone-card-club scenarios described in the complaint and supplemental pleadings all involve transactions in which a customer receives a cash advance on the day the customer writes a personal check,[8] but the cheek is held for a short *Page 1036 
period before it is presented to the bank for deposit. The fees and charges on the deferral are effectively interest paid for the use of the cash advance, regardless of whether there are direct fees and charges paid or whether those charges are in the form of a catalogue gift certificate or a telephone calling card of questionable worth. "A check cashing transaction becomes a loan when both parties explicitly agree to defer presentment of the check for a period of time." Lisa Blaylock Moss, Modern Day Loan Sharking: DeferredPresentment Transactions The Need for Regulation,
51 Ala. L.Rev. 1725, 1733-34 (2000) (footnote omitted).
We note that the trial court's reliance on Floyd,supra, 620 So.2d 576, for the proposition that the legislature did not intend to include deferred-presentment transactions as loan transactions subject to the Alabama Small Loan Act is misplaced. Floyd did not involve the issue whether the transaction constituted a loan under the Alabama Small Loan Act. Instead, the Floyd Court had to determine which of two regulatory statutes — the Alabama Small Loan Act or the Alabama Pawnshop Act — applied. The legislature specifically excluded "pawn transactions" from coverage under the Small Loan Act. TheFloyd Court concluded that an automobile certificate of title was not excluded from coverage by the Pawnshop Act because title was a "chose in action" and that, therefore, the Pawnshop Act, and not the Small Loan Act, applied. Notably, in reaching its conclusion, the Court looked to Black's LawDictionary to glean the legislature's intent when it used the term "tangible personal property" in the Pawnshop Act.
We find cases on Alabama's usury laws to be helpful because it is clear that the fees charged in association with the deferred-presentment transactions at issue exceed the maximum interest rate allowed by the Alabama Small Loan Act. It has long been the public policy of this State to condemn usurious contracts as "`tainted with an evil . . . intent'" and "`offensive to the policy and positive mandate of the law.'"State ex rel. Embry v. Bynum, 243 Ala. 138, 144,9 So.2d 134, 139 (1942) (citations omitted). In Bynum,
the State argued that equity jurisdiction extends not only to protect property rights and interest but also to protect the public from wrongs and to abate public nuisances, even in the absence of an express statutory definition or denunciation of an act or conduct to be a public nuisance. The Court stated:
 "[T]he state in pursuance of its established public policy in protecting the interest of its indigent and helpless citizens against the ravages of the loan shark pest, the economic prosperity of its industrial areas, the furtherance of public faith in the integrity and impartiality of its law courts, in the administration of justice therein, may invoke the aid of its courts of equity to enjoin the unlawful practices of the defendants as a public nuisance, restrain and enjoin them from proceeding in the law courts to enforce said void contracts, and keep them in subjugation to the law."
243 Ala. at 146, 9 So.2d at 142.
In Cochran v. State ex rel. Gallion, 270 Ala. 440,119 So.2d 339 (1960), the Court held that charging and retaining exorbitant credit-insurance premiums on loans was an attempt to evade the usury laws:
 "`The courts will closely scrutinize every suspicious transaction in order to ascertain its real nature. The law is diligent to discern any artifice, device or scheme to cover up usury. In determining whether the contract is tainted with *Page 1037 
usury, the court will look to the whole transaction. . . . It will consider the surrounding circumstances, the occurrence at the time of the making of the agreement, and the instruments drawn. The court will look to and construe the transaction by its substance and effect rather than its form, and if, from a consideration of the whole transaction, it becomes apparent that there exists a corrupt intent to violate the usury laws, the plain duty of the court is to inflict the penalty imposed by the statute.'"
270 Ala. at 444, 119 So.2d at 342 (quoting Grider v.Calfee, 242 Ala. 50, 52, 4 So.2d 474, 475-76 (1941)).
We have no difficulty concluding that the deferred-presentment transactions in this case are loans subject to the protections of the Alabama Small Loan Act. The question that must now be answered is whether those deferred-presentment transactions conducted pursuant to the terms of the consent order were, as the trial court held, lawful.
The Banking Department contends that the consent order was in essence an injunction to prevent the Banking Department from preventing the check cashers from making "payday loans" until the end of the next legislative session or until final adjudication of the case upon the merits. In order to obtain the Banking Department's agreement not to shut down their operations, the check cashers agreed to guidelines for conducting deferred-presentment transactions to control the worst abuses. The Banking Department contends that the consent order did not authorize lenders to charge fees that exceeded what is permitted by the Alabama Small Loan Act nor did it provide the check cashers with a safe harbor from past or future liability. The customers argue that the consent order does not apply to them because they were not parties to the agreement between the Banking Department and the check cashers that resulted in the order and cannot be bound by its terms.
The ACCA did not file a brief in this Court, although several individual check cashers did. Individual check cashers and MSC argue the deferred-presentment transactions they engaged in were legal because they never received a cease and desist order from the Banking Department and they were allowed to intervene and were ordered to comply with the consent order. AFS and MSC argue that the Banking Department and the customers are estopped from accepting the benefits of the consent order and then disputing the legality of the transactions conducted pursuant to that order.
Express Check Services contends that it did not conduct any deferred-presentment transactions before the consent order was entered in 1998 and has done business only pursuant to that order. Express Check Services contends that the Banking Department cannot now attack the validity of transactions conducted in accordance with the consent order when it agreed to the order. It also argues that the customers cannot now challenge the consent order because they agreed to move the trial court to extend the order until the case was resolved in the courts or until the issue was resolved by the legislature. Express Check Services argues that its due-process rights will be violated if it is held liable for business conducted pursuant to the consent order.
Sprague Enterprises, Inc., an individual check casher, argues that the trial court was correct in concluding that deferred-presentment transactions are not subject to the Alabama Small Loan Act and in finding that the transactions conducted pursuant to the consent order were indeed lawful. *Page 1038 
Speedee Cash contends that its position is unique because the trial court dismissed all claims against Speedee Cash after Speedee Cash had satisfied the Banking Department that it had ceased offering deferred-presentment transactions. Speedee Cash notes that the customers never challenged its dismissal. Speedee Cash argues that because the customers were not granted full intervention, they cannot complain about Speedee Cash's dismissal. Because the principal parties have dismissed Speedee Cash and because the customers are limited in their intervention, Speedee Cash contends, this Court should recognize its dismissal. Speedee Cash also argues that because it started conducting the transactions under the consent order and ceased performing those transaction before the consent order expired, Speedee Cash's transactions were legal. Speedee Cash argues that equitable estoppel should prevent the Banking Department and the customers from now contending that the transactions conducted pursuant to the consent order are illegal. Speedee Cash's argument that the customers should not complain of its dismissal is without merit because Speedee Cash's motion to dismiss was limited to the "defendants," and the customers are not "defendants" in this action.
A consent order "embodies an agreement of the parties and thus in some respects is contractual in nature. But it is an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees." Rufo v. Inmates of Suffolk County Jail,502 U.S. 367, 378, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992).
 "Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus the decree itself cannot be said to have a purpose; rather the parties have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it. Because the defendant has, by the decree, waived his right to litigate the issues raised, a right guaranteed to him by the Due Process Clause, the conditions upon which he has given that waiver must be respected, and the instrument must be construed as it is written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation."
United States v. Armour Co., 402 U.S. 673,681-82, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971) (footnote omitted).
The consent order in the present case established a set of guidelines or standards under which the Banking Department agreed to allow check cashers to operate during the pendency of this litigation or until corrective legislation was passed, whichever came first. The Banking Department acted outside of its authority in allowing the check cashers to operate under the terms of the consent order. In other words, the Banking Department exceeded its authority in agreeing *Page 1039 
not to enforce the provisions of the Alabama Small Loan Act against the check cashers. See Keith v. Volpe,118 F.3d 1386 (9th Cir.1997) (consent decree could not be interpreted to supplant California law because the state agency would not have had the authority to agree to such a decree);Perkins v. City of Chicago Heights, 47 F.3d 212, 216
(7th Cir. 1995)("While parties can settle their litigation with consent decrees, they cannot agree `to disregard valid state laws,' . . . and cannot consent to do something together that they lack the power to do individually."); Kasper v. Boardof Election Comm'rs, 814 F.2d 332, 341-2 (7th Cir.1987)("A consent decree is not a method by which state agencies may liberate themselves from the statutes enacted by the legislature that created them."). However, the Banking Department, as the State's banking and loan regulatory agency, cannot now claim that it was giving the check cashers "a temporary respite from having their businesses terminated" when it is the Banking Department's duty to protect the citizens of Alabama from unscrupulous lenders. (Banking Department's brief at p. 67.) That is, the Banking Department cannot now complain that the actions taken by the check cashers in accordance with the consent order violated the Alabama Small Loan Act because the Banking Department essentially condoned those actions in agreeing not to enforce the Small Loan Act.
The Banking Department and the check cashers received judicial approval of the consent order; deferred-presentment transactions have been conducted in accordance with the terms of the consent order from 1998 to 2003. Although a consent order is a voluntary agreement between the parties, it is also a judicially approved order. Wyatt v. King,803 F.Supp. 377 (M.D.Ala.1992). Consent decrees `"have attributes both of contracts and of judicial decrees,' a dual character that has resulted in different treatment for different purposes." Local Number 93, Int'l Ass'n of Firefighters v.City of Cleveland, 478 U.S. 501, 519, 106 S.Ct. 3063,92 L.Ed.2d 405 (1986). The Banking Department took a position in seeking approval of the consent order upon which the trial court relied. Judicial estoppel, as asserted by the check cashers, looks to the connection between the litigant and the judicial system.
In Ex parte First Alabama Bank, 883 So.2d 1236,1246 (Ala. 2003), we "embrace] the factors set forth inNew Hampshire v. Maine[, 532 U.S. 742 (2001),] and join[ed] the mainstream of jurisprudence in dealing with the doctrine of judicial estoppel." We held:
 "The United States Supreme Court in New Hampshire v. Maine, 532 U.S. 742, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001), recently observed that ` "[t]he circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle" `and then identified several factors as informative in determining the applicability of the doctrine of judicial estoppel. 532 U.S. at 750-51, 121 S.Ct. 1808
(quoting Allen v. Zurich Ins. Co., 667 F.2d 1162, 1166 (4th Cir. 1982)). The Court held that for judicial estoppel to apply (1) `a party's later position must be "clearly inconsistent" with its earlier position'; (2) the party must have been successful in the prior proceeding so that `judicial acceptance of an inconsistent position in a later proceeding would create "the perception that either the first or second court was misled."' (quoting Edwards v. Aetna Life Ins. Co., 690 F.2d 595, 599
(6th Cir.1982)); and (3) the party seeking to assert an inconsistent position must `derive an unfair advantage or impose an unfair detriment on the opposing party *Page 1040 
if not estopped.' 532 U.S. at 750-51, 121 S.Ct. 1808. No requirement of a showing of privity or reliance appears in the foregoing statement of factors to consider in determining the applicability of the doctrine of judicial estoppel."
883 So.2d at 1244-45.
In the present case, the Banking Department's position on appeal — that it can now seek to enforce the terms of the Alabama Small Loan Act — is inconsistent with its earlier position in seeking approval of the consent order that allowed the check cashers to operate outside the Alabama Small Loan Act.[9] The consent order, by its own terms, ceased to operate in 2003 with the enactment by the legislature of the Deferred Presentment Services Act, which now governs deferred-presentment transactions. The Banking Department would impose an unfair detriment on the check cashers if it is now allowed to seek to enforce the Alabama Small Loan Act as to deferred-presentment transactions that occurred while the consent order was in effect, We note that the doctrine of judicial estoppel has been applied to bar the government from repudiating the terms of a consent order. See United States v.Sherwin-Williams Co., 165 F.Supp.2d 797 (C.D.Ill.2001) (government was judicially estopped from recovering additional cleanup costs for environmental contamination from non-settling potentially responsible parties where consent decree with settling potentially responsible parties resolved all the government's claims for past and future costs of the cleanup). Accordingly, the Banking Department is estopped from enforcing the provisions of the Alabama Small Loan Act as to those deferred-presentment transactions that occurred while the consent order was in effect and that were conducted in accordance with the terms of the consent order.
The customers argue that they are not bound by the terms of the consent order because they were not parties to the consent order. They also argue that compliance with the consent order does not protect the check cashers from civil liability.
"It is a principle of general application in Anglo-American jurisprudence that one is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." Hansberry v. Lee, 311 U.S. 32, 40,61 S.Ct. 115, 85 L.Ed. 22 (1940). In Local No. 93, supra, black and Hispanic firemen sued the City of Cleveland under Title VII of the Civil Rights Act of 1964. A union representing white firemen intervened, and subsequently the minority firemen and the city agreed to a consent decree over the union's objections that Title VII barred the court from granting relief that benefited individuals who were not actual victims of discriminatory practices. The union argued that the minority firemen and the city could not enter into a consent decree without the union's consent. The United States Supreme Court stated:
 "[P]arties who choose to resolve litigation through settlement may not dispose of the claims of a third party, and a fortiori may not impose duties or obligations on a third party, without the party's agreement. A court's approval of a consent decree between some of the parties therefore cannot dispose of the valid claims of nonconsenting intervenors; if properly raised, these claims remain and may be litigated by the intervenor. And, of course, a court may *Page 1041 not enter a consent decree that imposes obligations on a party that did not consent to the decree."
478 U.S. at 529, 106 S.Ct. 3063 (citations omitted; emphasis added).
In the present case, the customers are not bound by the terms of the consent order. The customers were not parties to the action when the consent order was entered. The consent order does not purport to govern the rights or obligations of the customers in seeking redress for violations of the Alabama Small Loan Act. The customers attempted to intervene to present their objections to the consent order. The customers' intervention was limited to a "declaration of rights as to the legal issue of the applicability of the Alabama Small Loan Act to [the check cashers'] check cashing transactions as outlined in the [check cashers'] complaint." The customers could not seek monetary damages in this action, but the trial court did "not preclude the filing of separate lawsuits."
The check cashers' compliance with the consent order does not prevent them from incurring liability to the customers, who are nonparties to the agreement that resulted in the consent order. We find the following to be helpful:
 "The central feature of any consent decree is that it is not an adjudication on the merits. The decree may be scrutinized by the judge for fairness prior to his approval, but there is not a contest or decision on the merits of the issues underlying the lawsuit. Such a decree binds the signatories, but cannot be used a shield against all future suits by non-parties seeking to challenge conduct that may or may not be governed by the decree.
 "Nonparties have an independent right to an adjudication of their claim that a defendant's conduct is unlawful. Suppose, for example, that the government sues a private corporation for alleged violations of the antitrust laws and then enters into a consent decree. Surely, the existence of that decree does not preclude a future suit by another corporation alleging that the defendant company's conduct, even if authorized by the decree, constitutes an antitrust violation. The nonparty has an independent right to bring his own private antitrust action for treble damages or injunctive relief."
Ashley v. City of Jackson, 464 U.S. 900, 902,104 S.Ct. 255, 78 L.Ed.2d 241 (1983)(Rehnquist, J., joined by Brennan, J., dissenting from denial of certiorari review).
 Conclusion
The deferred-presentment transactions at issue are loans subject to the protections of the Alabama Small Loan Act. However, the Banking Department is estopped from enforcing the Alabama Small Loan Act against the check cashers for those deferred-presentment transactions conducted pursuant to the terms of the consent order while the order was in effect. The customers, who were not parties to the consent order, are not bound by the terms of the consent order. Accordingly, the judgment of the trial court is reversed insofar as it holds that the deferred-presentment transactions were not subject to the Alabama Small Loan Act. That part of the trial court's judgment holding that deferred-presentment transactions conducted in accordance with the consent order are legal is affirmed with regard to the Banking Department, but reversed insofar as it relates to the customers. The case is remanded for proceedings consistent with this opinion.
MOTION TO DISMISS DENIED; AFFIRMED IN PART; REVERSED IN PART; AND REMANDED. *Page 1042 
NABERS, C.J., and SEE, HARWOOD, STUART, SMITH, and PARKER, JJ., concur.
WOODALL, J., concurs in the result in part and dissents in part.
WOODALL, Justice (concurring in the result in part and dissenting in part).
I respectfully dissent from this Court's holding that "the Banking Department is estopped from enforcing the Alabama Small Loan Act against the check cashers for those deferred-presentment transactions conducted pursuant to the terms of the consent order while the order was in effect,"936 So.2d at 1041, and from the resulting affirmance, with regard to the Banking Department, of a portion of the trial court's judgment regarding deferredpresentment transactions conducted in accordance with the consent order. This holding is not supported by the terms of the consent order, and it is inconsistent with the positions taken by the Banking Department and the ACCA, the parties whose good-faith negotiations resulted in the consent order.
The Banking Department argues that the consent order "on its face is an injunction entered to keep the . . . Banking Department from shutting payday lenders down until the completion of the next legislative session or until final adjudication on the merits." Banking Department's brief, at 66. In opposing the customers' motion to intervene, the ACCA took an identical position, stating: "The consent order is limited in its scope in that it solely applies to the [check cashers] and the State Banking Department, and it simply defers enforcement actions by the State Banking Department by prohibiting the issuance of cease and desist orders during the pendency of this case." Further, the Banking Department argues that the "[consent order] is not a final judgment on the merits." Banking Department's brief, at 68. In opposing the customers' motion to intervene, the ACCA took an identical position: "As evidenced by the plain, unambiguous terms of the consent order, the court has not adjudicated the case on the merits and, in particular, has not decided whether deferred presentment transactions can be regulated under the Small Loan Act."
In all other respects, I concur in the result.
[2] The debit occurs through the automated clearinghouse and/or the electronic-fund transfer process rather than a check held for later presentment.
[3] The individually named employees of the Banking Department are not shown as appellants on the Banking Department's notice of appeal.
[4] The proliferation of "payday lenders" in the 1990s has been attributed to deregulation of the banking industry in the 1980s and early 1990s, which decreased the availability of short-term small loans from traditional banks. Scott A. Schaaf,From Checks to Cash: The Regulation of the Payday LendingIndustry, 5 N.C. Banking Inst. 339 (2001).
 "Regulations set ceilings on the interest rates banks could pay on deposits and restrictions on entry into banking limited other types of competition among banks. The low competitive pressures in this environment enabled banks to offer many services on which they lost money, making it up by paying below-market interest rates on large deposits. Among the money-losing services most banks offered were to permit people to maintain checking accounts with very small balances and low fees or no fees.With the deregulation of banking in the 1980s, banks were forced to pay market interest rates to attract larger deposits. This in turn prompted them to eliminate money-losing services they had previously offered."
John P. Caskey, Explaining the Boom in Check-CashingOutlets and Pawnshops, 49 Consumer Fin. L.Q. Rep. 4, 8-9 (1995). Other reasons cited for the increase in payday lenders are that retailers have limited financing options for those consumers who do not have credit cards because retailers have largely replaced installment contracts with credit-card purchases. Michael S. Barr, Banking the Poor, 21 Yale J. of Regulation 1 (2004). Also, finance companies that once provided small loans have recently focused on home-equity financing, which benefits only those who own and have equity in a house. Id.
[5] Lead appellate counsel for the customers in the present case were also lead appellate counsel in Alabama CatalogSales, supra, 794 So.2d 312, Speedee Cash,supra, 806 So.2d 389, Alternative Financial Solutions,supra, 821 So.2d 981, and Bess, supra,294 F.3d 1298.
[6] Before 1981, the Virginia Consumer Finance Act WSLS known as the Virginia Small Loan Act.
[7] We note that the Uniform Small Loan Act, which is the basis for the Alabama Small Loan Act, does not define the term "loan." Seventh Draft of the Uniform Small Loan Act(1942), reprinted in Barbara A. Curran, Trends in Consumer Credit Legislation
144-157(1965).
[8] This would also include signing an authori zation for an automatic debit from the customer's checking account in lieu of writing a personal check.
[9] None of the parties addresses any arguments concerning whether the statute of limitations would bar the State from enforcing the terms of the Alabama Small Loan Act.