LIVINGSTON, Janet, et al., Plaintiffs,

v.

FAST CASH USA, INC.,
et al., Defendants.

Wallace, Kelli R., et al., Plaintiffs,

v.

Advance America Cash Advance
Centers of Indiana,
Defendants.

Nos. 94S00–0010–CQ–609,
94S00–0010–CQ–610.

Supreme Court of Indiana.

Aug. 16, 2001.

Stephen L. Williams, Mann Law Firm, Terre Haute, IN, David H. Pope, Carr Tabb Pope & Freeman, Atlanta, GA, Clifford W. Shepard, Consumer Law Protection Offices, Indianapolis, IN, Daniel A. Edelman, Edelman Combs & Latturner, Chicago, IL, Attorneys for Plaintiffs.

Judy L. Woods, Bose McKinney & Evans LLP, Indianapolis, IN, James A. Chareq, Lovells, Washington, DC, Attorneys for Defendants.

Steven C. Shockley, Maggie L. Smith, Sommer & Barnard, PC, Indianapolis, IN, Attorneys for Amicus Curiae.

RUCKER, Justice.

### Case Summary

This cause comes to us as a certified question from the United States District Courts for the Southern District of Indiana, Indianapolis and Terre Haute Divisions, and for the Northern District of Indiana, Hammond Division. Pursuant to Indiana Appellate Rule 64, which allows certification of questions of Indiana law for consideration by this Court, we have accepted the following question: is the minimum loan finance charge permitted by Indiana Code section 24–4.5–3–508(7), when charged by a licensed supervised lender, limited by Indiana Code section 24–4.5–3–508(2) or Indiana Code section 35–45–7–2. The answer is yes.

### Facts and Procedural History

The certified question arises from numerous cases pending in the federal courts. A majority of the defendants are lenders who are in the business of making small, short-term, single-payment, consumer loans generally referred to as "payday" loans. Some of the defendants are collection agencies or attorneys who do not make loans but represent lenders in actions to collect from borrowers who have defaulted on their loan obligations.[1] The loan amounts range from $50 to $400 and extend for a period of less than thirty days. Lenders contract for and receive as a finance charge an amount equal to or less than the minimum loan finance charge permitted by Indiana Code section 24–4.5–3–508(7). Plaintiffs are persons who have obtained loans from one or more Lenders.

Although the details vary from person to person as well as from lender to lender, typically a payday loan works as follows.

The borrower applies for a small loan and gives the lender a post-dated check in the amount of the loan principal plus a finance charge. Depending on the lender, the finance charge varies from $15 to $33. In return, the lender gives the borrower a loan in cash with payment due in a short period of time, usually two weeks. When the loan becomes due, the borrower either repays the lender in cash the amount of the loan plus the finance charge, or the lender deposits the borrower's check. If the borrower lacks sufficient funds to pay the loan when due, then the borrower may obtain a new loan for another two weeks incurring another finance charge.

Acting on behalf of themselves and a putative class of borrowers, plaintiffs allege that Lenders violated Indiana law by contracting for and receiving the minimum loan finance charge permitted by Indiana Code section 24–4.5–3–508(7) when the finance charge exceeded the 36% annual percentage rate ("APR") specified in Indiana Code section 24–4.5–3–508(2) or the 72% APR specified in Indiana Code section 35–45–7–2. Each of the cases pending in the Southern District of Indiana has been stayed pending this Court's determination of the certified question. The cases in the Northern District of Indiana have been dismissed without prejudice pending this Court's determination.

### Discussion

The 1968 Uniform Consumer Credit Code was originally adopted by this State's Legislature in 1971 and is referred to as the Indiana Uniform Consumer Credit Code ("IUCCC"). Rates on loan finance charges for supervised loans[2] are gov-

---

1. For ease of reference we refer to all defendants collectively as "Lenders."

2. A "supervised loan" is defined as a "consumer loan in which the rate of the loan finance charge exceeds twenty-one percent (21%) per year...." Ind.Code § 24–4.5–3–501(1).

erned by Indiana Code section 24–4.5–3–508(2) and minimum loan finance charges[3] are governed by Indiana Code section 24–5–3–508(7). More specifically, subsection 3–508(2) provides in relevant part:

> The loan finance charge, calculated according to the actuarial method, may not exceed the equivalent of the greater of the following: [ ] the total of [ ] thirty-six percent (36%) per year on that part of the unpaid balances of the principal which is three hundred dollars ($300)....

In turn, subsection 3–508(7) dictates in relevant part:

> With respect to a supervised loan not made pursuant to a revolving loan account, the lender may contract for and receive a minimum loan finance charge of not more than thirty dollars ($30).[4]

The parties agree that a fifteen-day loan of $200 with a minimum loan finance charge of $33 represents an APR of interest totaling 402%. However, according to Lenders, subsection 3–508(7) is an exception to subsection 3–508(2). Relying on various tenets of statutory construction Lenders contend they are entitled to receive from a borrower a minimum loan finance charge in any amount up to $33 even if the charge exceeds the maximum APR of 36%. We rely on similar tenets but reach a different conclusion.

Where a statute has not previously been construed, the express language of the statute controls the interpretation and the rules of statutory construction apply. *Ind. State Fair Bd. v. Hockey Corp. of America*, 429 N.E.2d 1121, 1123 (Ind.1982). We are required to determine and effect the legislative intent underlying the statute and to construe the statute in such a way as to prevent absurdity and hardship and to favor public convenience. *Superior Constr. Co. v. Carr*, 564 N.E.2d 281, 284 (Ind.1990). In so doing, we should consider the objects and purposes of the statute as well as the effects and repercussions of such an interpretation. *State v. Windy City Fireworks, Inc.*, 600 N.E.2d 555, 558 (Ind. Ct.App.1992), *adopted by* 608 N.E.2d 699.

Before the 1971 adoption of the IUCCC, the Indiana Legislature had passed an array of lending and usury laws. Replaced by the IUCCC, many had been in existence before the turn of the century.[5] One such statute, commonly referred to as the "petty loan" statute, was specifically designed to "provide for a limited and uniform rate of interest upon small loans for short terms." *Cotton v. Commonwealth Loan Co.*, 206 Ind. 626, 190 N.E. 853, 855 (1934); Pub.L. No. 167–1913, §§ 1–5, 1913 Ind. Acts 457–60. Unlike

---

**3.** In relevant part, "loan finance charge" is defined as "all charges payable directly or indirectly by the debtor and imposed directly or indirectly by the lender as an incident to the extension of credit...." I.C. § 24–4.5–3–109(1)(a).

**4.** Since 1994, the minimum loan finance charge has been subject to bi-annual indexing on July 1 of even numbered years and thus is adjusted automatically once every two years. I.C. § 24–4.5–3–508(6); I.C. § 24–4.5–1–106. The current minimum loan finance charge is $33.

**5.** *See* Pub.L. No. 125–1917, § 2, 1917 Ind. Acts 404 (allowing lenders of "small loans" to charge 3½% interest per month on loans not exceeding $300); I.C. ch. 80, § 7043 (1901) (allowing interest rate of up to 6% per year in absence of written agreement and up to 8% per year if a written agreement exists); I.C. ch. 74, § 5198 (1888) (same); I.C. ch. 5, § 1 (1870) (capping interest rate chargeable to a borrower by a lender at 6% per year); I.C. ch. 57, § 1 (1852) (same); I.C. art. 3, § 25 (1843) (same).

most lending statutes for which interest rates were generally based on an annual rate, the petty loan statute differed in that it was based on a monthly rate. *Cotton*, 190 N.E. at 855 (discussing the then existing interest rate of 3½% per month for loans up to $300). With the 1971 enactment of the IUCCC, the legislature retreated from a monthly rate of interest and instead set the interest rate at 36% per year for loans of $300 or less. *See* I.C. § 24–4.5–3–508(2)(a)(i); Pub.L. No. 366–1971, § 4, 1971 Ind. Acts 1637–38. Of course, with this change nothing prohibited lenders from continuing to provide "small loans for short terms." *Cotton*, 190 N.E. at 855. However, the statute suggests that although the legislature apparently contemplated the continued existence of small loans, consistent with its stated purpose "to simplify, clarify and modernize the law governing retail installment sales, consumer credit, *small loans and usury*," I.C. § 24–4.5–1–102(2)(a) (emphasis added), the legislature anticipated that even though small, the loans would extend for at least one year. Subsection 3–508(3)(b) lends support to the view that the then newly enacted IUCCC anticipated longer term loans. That subsection refers to "prepayment" which in turn is controlled by Indiana Code section 24–4.5–3–210. We observe that a one or two-week payday loan is not very amenable to a prepayment scheme.

The early version of subsection 3–210 also supports the view that the IUCCC anticipated loans for longer than a week or two. In 1971 for example, in the case of prepayment for a loan in excess of $75, a lender was allowed to receive a minimum loan finance charge provided it did not exceed $7.50 or the finance charge contracted for. *See* I.C. § 24–4.5–3–210 (1971). Thus a $200 two-week loan would generate $2.77 in interest, i.e., "the finance charge contracted for." It would have been more than an anomaly if a lender were allowed to receive a minimum loan finance charge of $2.77 for a two-week loan paid at the end of the term but receive $7.50 as a minimum loan finance charge if that same two-week loan were paid off a week early.

Subsection 3–508 has been amended three times since 1971. However, each amendment has referred to the prepayment subsection 3–210. At present, subsection 3–508 as well as subsection 3–210 [6] works substantially the same as it has always worked: a lender is allowed to charge up to the amount specified in subsection 3–508(7), limited by the total finance charge that was originally provided for in the contract. Hence, a two-week $200 loan still generates $2.77 in maximum interest. The principal difference between the 1971 version of subsection 3–508 and the current version is that the minimum loan finance charge is now $33 for loans up to $300. If subsection 3–508(7) represents an exception to subsection 3–508(2), as Lenders contend, then there would exist an even greater anomaly today than that which would have existed under the 1971 version of the statute. Specifically, if Lenders are correct, then they would be entitled to receive $2.77 for a two-week loan paid at the end of the term, but

---

**6.** The statute provides in relevant part:

Upon prepayment in full of a consumer loan, refinancing, or consolidation, other than one (1) under a revolving loan account, if the loan finance charge earned is less than any permitted minimum loan finance charge (IC § 24–4.5–3–2–1(6) or IC § 24–4.5–3–508(7)) contracted for, whether or not the consumer loan financing, or consolidation is precomputed, the lender may collect or retain the minimum loan finance charge, as if earned, not exceeding the loan finance charge contracted for.

I.C. § 24–4.5–3–210(2).

entitled to an incredible $33 if the two-week loan were paid off early, for example after a week or even one day. To interpret the statute as Lenders suggest—allowing a minimum finance charge of $33 for a loan that otherwise would generate what amounts to pennies in interest—is inconsistent with the purposes and policies of the IUCCC and creates an absurd result which the legislature could not have intended when the statute was enacted or when the various amendments were adopted.

Lenders complain that reading the statute inconsistent with their own interpretation either renders subsection 3–508(7) a nullity or treats it as mere surplusage. We disagree. Subsection 3–508(7) would be rendered a nullity or mere surplusage only if subsection 3–508(2) can be read as anticipating short term loans. As we have attempted to demonstrate, we do not believe that is the case. In essence these statutes simply do not work very well when applied to short-term payday type loans. By contrast, subsections 3–508(2) and (7) work together harmoniously for loans of at least a year. For example, a $200 one-year loan would entitle the lender to $72 in interest if the loan were paid at the end of the term. In the event of prepayment—even after one day—the lender would be entitled to a minimum loan finance charge of $33. This seems to make sense. Even though the lender would not receive the full amount of interest originally anticipated, the lender is still afforded a modest but reasonable return on an investment and also allowed to recoup administrative costs associated with setting up a small loan. Only because Lenders have made a business decision to offer short-term payday loans are they faced with a dilemma which in their view justifies a $33 minimum loan finance charge. *See* Reply Br. of Def. at 6 (complaining "annual rates of interest do no not adequately compensate the lender."). This Court can offer Lenders no refuge. Even if short term payday loans were never contemplated by the IUCCC, they are nonetheless subject to and controlled by that statute. Accordingly, Lenders may contract for and receive a loan finance charge of not more than $33 as set forth in subsection 3–508(7) provided the resulting APR does not exceed the interest limit established by 3–508(2) or Indiana's loan-sharking statute.[7]

### *Conclusion*

We conclude that the minimum loan finance charges for supervised loans provided for in Indiana Code section 24–4.5–3–508(7) are limited by the maximum 36% APR allowed in Indiana Code section 24–4.5–3–508(2). We further conclude that minimum loan finance charges for supervised loans provided for in Indiana Code section 24–4.5–3–508(7) are limited also by Indiana Code section 35–45–7–2.

DICKSON and SULLIVAN, JJ., concur.

BOEHM, J., concurs with separate opinion.

SHEPARD, C.J., dissents with separate opinion.

BOEHM, Justice, concurring.

I agree with the majority's answer to the certified question. I offer additional support for their answer. In capsule form,

---

7. The statute provides in relevant part:
   A person who, in exchange for the loan of any property, knowingly or intentionally receives or contracts to receive from another person any consideration, at a rate greater than two (2) times the rate specified in IC § 24–4.5–3–508(2)(a)(i), commits loansharking, a Class D felony.
   I.C. § 35–45–7–2.

the plaintiffs contend that the provision in subsection 508(7)[1] permitting a minimum finance charge of $33 per loan does not apply to a payday loan if the loan's annual interest rate exceeds the APR permitted under subsection 508(2). The "Payday Lenders" respond that this view renders subsection 508(7) surplusage. The plaintiffs counter that claim by saying that subsection 508(7) permits collection of a minimum $33 loan finance charge in the case of a prepaid loan, assuming the loan was for a time period for which a $33 loan finance charge would be lawful under subsection 508(2), but does not validate a minimum charge that is in excess of the subsection 508(2) limits calculated over the initial term of the loan.

As I see it, the issue is whether the $33 minimum loan finance charge provided by subsection 508(7) is collectible if it exceeds the loan finance charge allowed under subsection 508(2) for the loan as written for its full term. I think it is not. If a loan is prepaid, subsection 210(2) authorizes the collection of the "minimum loan finance charge, as if earned, not exceeding the loan finance charge contracted for." In this context, I take "as if earned" to mean the loan charge prorated to the date of prepayment. Similarly, the "loan finance charge contracted for" in subsection 210(2) is the amount of loan finance charge that would be collected if the loan were held to its full term. That amount, for a "supervised loan," is capped by subsection 508(2). Thus, in the prepayment context, the minimum charge is capped by the "loan finance charge contracted for," and the full $33 cannot lawfully be collected if it exceeds that amount.

Given this limitation in the prepayment of a loan that is within the allowable finance charges, it would be more than anomalous to permit the full $33 to be collect-

ible in the case of a loan that carries a finance charge vastly in excess of the allowable charges. By way of example, a lender who makes a $100 loan for six months may lawfully collect a loan finance charge of $18 when the loan is repaid in full at the end of the six-month term ($18 is 36% per annum on $100 for one half year). Because subsection 210(2) limits the prepayment minimum charge to "the loan charge contracted for," only $18—not the $33 minimum charge provided in subsection 508(7)—is collectible if this loan is prepaid, say at three months when only $9 is "earned." The payday lender nevertheless contends it can collect $33 for a two-week loan of the same amount. This result seems to fly in the face of the statutory scheme.

Another way to make the same point is to say that subsection 210 provides for recovery of a minimum charge on prepayment even if that charge exceeds the initially contracted charge prorated to the date of prepayment. Subsection 508(7) sets the amount of the minimum charge, but it does not constitute an independent exception to the limits imposed by subsection 508(2) on the loan charge authorized in the loan to full term. Simply put, I agree with the Court that the Uniform Consumer Credit Code (UCCC) is based on an assumption, but it is not the assumption that loans are necessarily for at least one year. Rather, I think the legislation assumes lawful loans, i.e. it assumes a lender cannot initially contract for a loan finance charge greater than the limits imposed by subsection 508(2).

Although this line of reasoning is less than fully clear from the language of the statute, I think it is the only sensible way to read these intertwined provisions. First, it is notable that subsection 508(2)

---

**1.** All statutory references are to Indiana Code 24–4.5–3.

does not provide that the loan finance charge may be "the greater of the minimum finance charge" or the percentages allowed under (a) and (b) of that subsection. If it meant what the lenders contend in this case, that would be a much simpler way to provide a fixed dollar minimum loan charge irrespective of the term or amount of the loan. But subsection 508(2) does not do that. Rather, it allows the loan finance charge to be "the greater of" the percentages in (a) or (b). Separately, subsection 508(7) provides the amount of the minimum charge, in the case of a supervised loan,[2] that is then incorporated into the provisions of subsection 210(2) dealing with prepayment.

The only conclusion I can reach from this is that the court is quite clearly correct in concluding that payday loans were not contemplated at all by the drafters of the IUCCC. This view of the structure of the act is fully consistent with the history of consumer credit legislation outlined by the majority. In oversimplified terms, the legal environment of the 1960s did not contemplate the revolving credit lines that are now familiar to everyone and form the basis of the credit cards most consumers use routinely. Usury laws, small loan acts and similar legislation presented significant legal issues to credit forms that, although very useful to a consumer economy, require more than 8% simple interest charges and do not fit into fixed payment schedules. The UCCC and its Indiana version were drafted to address these emerging forms of consumer finance. They assumed the problems of that day and assumed transactions in the then known forms, but they did not contemplate doing away altogether with regulation of excessive charges.

Subsection 508(7)—the provision the defendants rely on—has been in the IUCCC since 1982. Its function—to permit recovery of initial loan processing costs in case of prepayment—is perfectly plausible and consistent with the overall scheme of the statute. We are told payday loans first appeared in this state in 1994. That fortifies my view that the statute assumes that a loan will be written in compliance with the loan finance charge limits of subsection 508(2), and that the minimum charges will be allowed only to the extent they do not exceed the amounts collectible under a lawful loan held to full term.

My confidence in this reading is bolstered because I think the logic of the defendants' position produces demonstrably absurd results. The same arguments advanced to justify a $33 minimum charge for a two-week loan of $100 equally justify a $33 charge for a two-minute loan of $1. I find that result clearly not within the contemplation of the legislature. There must be a bright line between permissible and impermissible lending practices. The only line that seems to me to make sense, and the only one suggested by the statute itself, is the one plaintiffs propose: the initial term of the loan must be sufficient to support the minimum charge consistent with the limitations of subsection 508(2).

It also seems to me that the justifications offered by payday lenders do not hold water. The costs of setting a loan up on the lender's books, etc., are cited as the basis for a minimum charge. This makes sense in the context of a loan that is initially contemplated to carry a finance charge allowed by subsection 508(2). But ease of making the loan, lack of paperwork, and the lender's assumption of cred-

2. Indiana Code subsection 24–4.5–3–201(6) supplies the minimum charge to be incorporated into subsection 210(2) in the case of an unsupervised "consumer loan not made pursuant to a revolving loan account."

it risk are cited as economic reasons justifying payday loans. These justifications are somewhat inconsistent with those offered to explain the minimum charge in the first place. To return to the two-minute loan of $1, presumably that business would be highly profitable despite the large uncollectible receivables generated by assumption of any and all credit risks and extremely informal lending practices. At that rate of return a prudent lender would shovel money out the door as fast as it could and hope for the best on the costs of business represented by default rates, credit risks, poor documentation, etc. Although that example is unrealistic, the payday lending practices seem only quantitatively, not qualitatively, different from this extreme. The rates charged by the lender here—hundreds of percent per year—would seem to justify the same willy nilly lending.

Finally, defendants point to the traditional arguments against regulation and in favor of free election of choices afforded in the marketplace. But it seems clear to me that the legislature has chosen in the IUCCC to prohibit some lending practices and to restrict the parties' ability to contract for whatever is agreed. In short, it is very clear that some forms of lending practices are prohibited, and the only question is whether payday loans are among the practices proscribed by the statute. For the reasons given above, I conclude they are. I agree that the "multiple contracts" provision referred to by the Chief Justice may also be relevant to the ultimate issues in this case, but because the federal court declined to certify that question, I express no view as to it.

SHEPARD, Chief Justice, dissenting.

I read subsection 508(7) to mean what it says, in straightforward terms: "With respect to a supervised loan not made pursuant to a revolving loan account, the lender may contract for and receive a minimum loan finance charge of not more than thirty dollars ($30)." [1]

I think subsection 508(2) limiting annual interest and subsection 508(7) permitting a minimum finance charge were adopted by the legislature on the premise that the two would work together like this: a lender can charge no more than 36% per year, but if the loan period is so short or the loan so small that this rate might produce just a few dollars, a minimum of $33 may be charged. This harmonizes both provisions by treating subsection 508(7) as an exception to subsection 508(2), and it makes $33 a true "minimum loan finance charge" using the common meaning of the words.

The majority concludes that subsection 508(7) comes into play only in the event of loan prepayments, because it is referenced in § 210 ("Rebate Upon Prepayment"). Although subsection 508(7) does perform this additional function, I still find its primary purpose in its plain language. If the legislature had intended to permit a minimum loan finance charge but limit it to prepayment situations, surely the logical approach would have been to state the minimum charge, in dollars, in the prepayment section and eliminate subsection 508(7) entirely, or at least to clarify this limitation in subsection 508(7).

This is not to say that the legislature contemplated allowing lenders to collect $33 every two weeks on what is for all practical purposes one continuing loan.

1. This $30 amount is periodically adjusted to reflect inflation, as the majority explains, and is currently set at $33.

Lawmakers probably recognized that they could not anticipate all possible schemes and adopted a general provision aimed at preventing such possibilities. Ind.Code § 24–4.5–3–509, "Use of Multiple Agreements," prohibits lenders from permitting borrowers to "become obligated in any way under more than one loan agreement with the lender ... with intent to obtain a higher rate of loan finance charge than would otherwise be permitted by the provisions on loan finance charge[s] for supervised loans...." This provision effectively prohibits sequential fee-charging practices.

It has been awhile since we last encountered a statute in such serious need of revision. Our federal cousins might take comfort in knowing that, like them, we found the task of parsing its various provisions very difficult (but had nowhere else to send out for help).