

FILED

Dec 30 2019, 8:36 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

William R. Groth
Fillenwarth Dennerline Groth & Towe, LLC
Indianapolis, Indiana

Kristina Frey
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Robin C. Clay
Curlin & Clay Law Association of Attorneys
Indianapolis, Indiana

Robin A. Hall
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Donald B. Kite, Sr.,<br>*Appellant-Petitioner,*<br><br>v.<br><br>Alexandra Curlin,<br>*Appellee-Respondent.* | December 30, 2019<br><br>Court of Appeals Case No.<br>19A-MI-51<br><br>Appeal from the Marion Circuit Court<br><br>The Honorable Sheryl Lynch, Judge<br><br>Trial Court Cause No.<br>49C01-1811-MI-45470 |

**Mathias, Judge.**

[1] Donald B. Kite, Sr. ("Kite") appeals the order of the Marion Circuit Court denying his petition for an election contest in which he claimed that Alexandra Curlin ("Curlin") was ineligible to hold the seat on the school board to which she was elected. On appeal, Kite claims that Curlin does not reside in the

district she was elected to represent and is therefore statutorily ineligible for the school board seat. Curlin argues that her residency, and therefore her ineligibility, was discoverable prior to the election and that Kite's post-election challenge is untimely. Because we agree with Kite that Curlin continues to be ineligible for the seat she holds, we reverse and remand.

## Facts and Procedural History

In 2015, the school board ("School Board") of the Metropolitan School District of Washington Township ("MSDWT") adopted a plan (the "2015 Plan") regarding the organization and composition of the School Board. The 2015 Plan provided that two members of the School Board would be elected at-large, but "preserve[d] the current and historical practice of board members elected by and representing all MSDWT voters without concentration of a majority of the Board from just one geographical area (residence district)[.]" Ex. Vol., Joint Ex. 1, p. 2. The 2015 Plan also provided that any candidate for a seat representing a residence district must have lived in that district "for a period of time in excess of one (1) year prior to the date of the general election on which the candidate's name appears on the ballot for election[.]" *Id.* at p. 3–4.

MSDWT is divided into three geographic residence districts. Areas south of 75th Street between Spring Mill Road and College Avenue are within MSDWT Residence District 1, and areas north of 75th Street between Spring Mill Road and College Avenue are within MSDWT Residence District 2.The following diagram is based on the exhibits submitted by the parties and is offered as a visual aid to the reader:



See Ex. Vol., Petitioner's Ex. B. It is undisputed that Kite has lived in District 2 for more than one year prior to the election at issue. Curlin resides at 7431 North Meridian Street, which is between Spring Mill Road and College Avenue, but three houses south of 75th Street. It is undisputed that Curlin therefore resides in District 1.

[4] Kite was the incumbent representing District 2. On August 23, 2018, Curlin filed a "Petition of Nomination and Consent for School Board Office Elected in 2018," State Form CAN-34, so that she could run against Kite for the seat representing District 2. *Id.*, Joint Ex. 6. In this form, Curlin correctly listed her

address as 7431 North Meridian Street. Although she listed her correct address, which lies within District 1, she indicated that she was seeking the seat representing District 2. In this form, Curlin incorrectly certified that she "meet[s] all qualifications for this office, *including residency requirements*[.]" *Id.* (emphasis added).

[5] The election was held on November 6, 2018. Curlin received 14,723 votes, and Kite received 13,946 votes. The election results were certified, and Kite did not request a recount. However, the day after the election, while the votes were still being counted, Kite was informed that Curlin did not live in District 2. Accordingly, on November 15, 2018, nine days after the election, Kite filed a verified petition to contest the election on grounds that Curlin filed for and sought the District 2 seat even though she lived in District 1. Kite's petition claimed that Curlin was therefore ineligible to run for election or be seated as a District 2 School Board member, because she did not meet the residency requirement.

[6] The trial court held a hearing on Kite's petition on December 11, 2018. A week later, pursuant to Kite's request under Trial Rule 52, the trial court issued findings of fact and conclusions of law providing in relevant part:

> 4. The defined residence districts are . . . depicted in a map that is posted on MSDWT's website and on the Marion County Election Board ("MCEB") website . . . although the maps posted on the MCEB's website . . . and the MSDWT's website are of different levels of clarity.

5. The written descriptions of the MSDWT residence District boundaries which accompany the map on the MSDWT website describes boundaries which make residences north of 75th street between Spring Mill and College fall into residence District 2 and residences south of 75th street between Spring Mill and College fall into residence District 1. **Because Respondent Alexandra Curlin ("Curlin") lives south of 75th Street between Spring Mill and College, she resides, as she testified during the hearing in this matter, in residence District 1.**

6. Curlin met with Kite, the District 2 incumbent, around July 15, 2018 to discuss her running for MSDWT School Board. Curlin contacted Kite to meet. Kite asked Curlin where she lived. Curlin said District 2 at 75th and Meridian Street but did not give Kite her specific address of 7431 N. Meridian Street.

7. Kite advised Curlin she could run for the seat in District 2 or for an At Large seat for MSDWT School Board.

8. Kite and Curlin texted several more times after their initial meeting. Kite even texted Curlin to see if she decided what seat to run for.

* * *

15. Both at the time Curlin filed her candidacy and up to the present, Curlin has resided at 7431 N. Meridian Street, Indianapolis, IN 46260 since 2012. In fact, Curlin stated in her CAN-34 she resided at 7431 N. Meridian Street, Indianapolis, IN 46260. Curlin's CAN-34 form was a public record since received by the MCEB August 24, 2018.

16. Kite agreed the CAN-34 form is a public record.

17. However, as discovered by Kite, and as acknowledged by Curlin in her sworn testimony, Curlin's address is actually within residence District 1 boundaries, rather than in residence District 2.

18. However, at the time of filing her candidacy documents, Curlin, relying on her interpretation of the MSDWT's district map, believed that she did in fact live in residence District 2.

19. Kite filed this contest action under Ind. Code [chapter] 3-12-8, alleging that Curlin was ineligible to seek or occupy the office of MSDWT Board of Education member in residence District 2 because she did not meet the statutory residency requirement to either run or to serve as a member in residence District 2, and because seating her would violate Indiana Code § 20-23-4-27(c)(3) and the 2015 Restated Plan ("Plan") which requires that no more than two (2) members live in any one residence district, and that each district have at least one member.

20. Kite discovered the day after the November 6, 2018 election after someone told him, Curlin did not reside in District 2 while the votes were still being counted.

21. Kite did not investigate his opponent Curlin's eligibility to run in District 2 as she was an attorney and he relied on what she told him when they met before she filed her CAN-34 on August 24, 2018. Both Kite and Curlin are attorneys.

22. Kite knows campaign reports are on the MCEB website with candidate's addresses, but someone in his campaign looked at Curlin's campaign reports. Kite did not.

23. Kite was aware of Curlin's CAN-34 form as candidates look to see who stands by the opponent as they are curious.

24. Kite's campaign maintained a Facebook page. Kite's campaign was in control of the Facebook [page]. Kite's Facebook demonstrates his campaign investigated Curlin with his accomplishments and information on Curlin's background.

25. Kite agreed the things on his campaign Facebook [page] about Curlin were to educate the voters about Curlin. Kite checked the Facebook [page] frequently.

26. Curlin relied on the MSDWT website map to decide she was in District 2 which did not have street lines. Curlin did not look at the MCEB website map before filing her CAN-34 form.

27. Curlin's house is less than half of a football field from 75th street where the line of District 2 is located.

28. Curlin believed she resided in District 2 when she filed her CAN-34 form. She had consulted with Kite and others including the MCEB staff when she filed her CAN-34 form. Curlin did not consult the MSDWT attorney before filing her CAN-34.

29. Curlin was aware that she could run for an At Large seat and a District 2 seat as she thought she resided in District 2.

30. Curlin felt like she did her due diligence. Curlin did not give an incorrect address of where she resided on the CAN-34 form.

31. Curlin believed she signed the CAN-34 form to be accurate and true.

32. Curlin discovered she lived in District 1 instead of District 2 after the election when MSDWT's attorney gave her the heads up of Kite's Petition to Contest Election.

**33. Curlin at hearing acknowledged she knows now that she does not reside in District 2.**

34. The Court finds Curlin credible stating that she had no intent to deceive voters or commit fraud as she put her correct address on the CAN-34 form.

35. All Washington Township voters vote for all MSDWT School Board Members regardless of what district they reside in. The MSDWT School Board Members represent the entire MSDWT.

CONCLUSIONS OF LAW

1. **It is undisputed that Curlin's address does not fall within residence District 2 and is in fact in residence District 1.**

2. Both Curlin and Kite maintain that they were unaware of the fact that Curlin was ineligible to run for the District 2 seat under both Indiana Code § 20-23-4-27(c)(3) and the Plan until after the election on November 6, 2018.

3. Thus, the issue this Court must weigh is whether Indiana Code § 20-23-4-27(c)(3) is controlling even post-election after the voters have spoken.

4. Indiana law strongly disfavors post-hoc disenfranchisement of voters. The Indiana Constitution guarantees that "[a]ll elections shall be free and equal." Ind. Const. art. 2, § 1. "Consistent with this guarantee, the Indiana Supreme Court has always been wary of overturning the will of the voters who have freely and willingly cast their ballots." *See, e.g., Burke v. Bennett*, 907 N.E.2d 529 (Ind. 2009), *White v. Indiana Democratic Party ex rel. Parker*, 963 N.E.2d 481 (Ind. 2012).

5. Courts liberally construe the statutes governing post-election contests "'in order that the will of the people in the choice of public officers may not be defeated by any merely formal or technical objections.'" *Pabey v. Pastrick*, 816 N.E.2d 1138, 1148 (Ind. 2004) (quoting *Tombaugh v. Grogg*, 146 Ind. 99, 103, 44 N.E. 994, 995 (1896)).

6. Because the five (5) MSDWT Board members, who hold seats from different residence districts to promote "geographic diversity", still serve the entire MSDWT area as a whole and are elected by the Washington Township residents as a whole, not by district, **it can be argued that the resident requirement is a mere formal or technical issue when weighed against the disenfranchisement of voters.**

7. The alternative, as argued by Kite is for the Court to conclude the District 2 position is vacant, and apply Article 15, Section 3 [of the Indiana Constitution], which states that when an elective term ends and no qualified person has been elected and qualified to take over the duties of the office, the person holding that office at the end of the elective term has a right and duty to hold the office and discharge his duties for an additional term until the next general election for that office. *Patterson v. Dykes*, 804 N.E.2d 849, 853–54 (Ind. Ct. App. 2004)

8. However, the facts of the *Dykes* case and the subsequent case law relied on by Kite in drawing this conclusion do not apply in this instance. The 2004 *Dykes* case does not discuss disenfranchisement of voters. Not to mention the *Dykes* case is an Indiana Court of Appeals case and not an Indiana Supreme Court case.

9. In *Dykes*, the unsuccessful incumbent sought declaratory judgment, preliminary injunction and summary judgment that the councilman-elect was ineligible to hold office because of a prior felony conviction. This is not the case herein.

10. Here, there has been no fraud or felony committed by Curlin. **Rather, Curlin's ineligibility is at most merely technical**. Curlin ran for a seat in the incorrect district and gave her correct address on the CAN-34, but each MSDWT School Board Member serves the entire Washington Township area and not only their district. Furthermore, all MSDWT School Board Members are voted on and elected by the entire Washington Township residents and not by the district.

11. No evidence of fraud or bad faith has been presented to show that Curlin submitted her candidacy for the District 2 seat with an intent to defraud or mislead voters.

12. This Court cannot rely on the 2004 Indiana Court of Appeals, *Dykes* case.

13. In *White v. Ind. Dem. Party*, 963 N.E. 2d 481 (Ind. 2012), ("White Case") the Court concluded that "the Code places a burden on political campaigns to investigate and vet their opposition before the pre-election time limitations expire, but that is better than the alternative: that a challenger might ignore a known (or knowable) disqualification challenge before the election, wait to see who won at the polls, and then seek to set aside the results of the democratic process. Such a result is inconsistent with free elections and respect for voters' expressed preferences.["]

14. Curlin included her correct address on the CAN-34, which was a matter of public record before the election and remains public record today. Kite was aware of Curlin's area of address during the campaign before the election.

15. Even though Kite did conduct opposition research on Curlin, he did not disclose that her address fell in residence District 1 until after Curlin won the election. Absent proof that "the voters willfully threw away their ballots on a candidate they knew could not lawfully be elected, the mere fact that the one who received the largest vote was ineligible to be elected . . . is not enough to give the candidate who received the less number the right to the office." *Burke* at 533 (Ind. 2009) *citing State ex rel. Heston v. Ross*, 84 N.E. 150–151 (1908).

16. The knowledge of the ineligibility of a candidate must be such on the part of those voting for him as to imply a willfulness in acting and voting in defiance of the law and in opposition to such knowledge, in order to nullify such votes without nullifying all votes "equally" at the same time. *Oviatt v. Behme*, 147 N.E. 2d 897, 901 (Ind. 1958). "It is a serious matter under our system of government to deprive one of an office for which he has received the highest number of votes." *Id.* "The constitutional provision that 'all elections shall be free and equal' means that 'the vote of every elector is equal in its influence upon the result to the vote of every other elector.'" *Id.*

17. It is clear that Kite was aware of Curlin's potential run in District 2 as early as mid-July 2017 [sic, read 2018]. Not to mention, Curlin filed her CAN-34 received by the MCEB August 24, 2018 that was a public form that Kite could have verified his opponent's residence requirement as he advised Curlin she could run in District 2 or the At Large seat.

18. Curlin should have reviewed the MCEB website map to determine what seat she could run for in the November 6, 2018 MSDWT School Board Election. In the same manner, Kite should have investigated his opponent Curlin per the "White Case" to see if she was eligible and qualified to run against him as the incumbent for his 4th term before the election on November 6, 2018.

19. Kite's incumbent campaign investigated Curlin as evidenced on Facebook with other issues, but failed to investigate and vet his opponent Curlin's residency requirement before the pre-election time limitations expired despite knowing he has a potential opponent as early as mid-July 2018.

20. Instead Kite in the alternative ignored investigating his opponent Curlin's residency which was public record and known for sure August 24, 2018 when Curlin filed her CAN-34 with the MCEB. Kite waited to see who won at the polls and then sought to essentially set aside the results of the democratic process when he filed his Verified Petition to Contest Election filed November 15, 2018. The election was November 6, 2018.

21. The Indiana Supreme Court has addressed post-election challenges. Disfranchisement of voters is discouraged.

22. 51.36% of Washington Township voters voted for Curlin without knowing she did not reside in District 2.

23. This Court is not in the position to disenfranchise voters post-election.

Appellant's App. pp. 9–18 (italics in original, bold emphases added). The trial court therefore denied Kite's petition, and Kite now appeals.

## Standard of Review

Where a trial court enters specific findings and conclusions, we apply a two-tier standard of review: we first determine whether the evidence supports the findings, and then we determine whether the findings support the judgment. *Marion Cty. Auditor v. Sawmill Creek, LLC*, 964 N.E.2d 213, 216 (Ind. 2012). We will "'not set aside the findings or judgment unless clearly erroneous.'" *Id.* (quoting Ind. Trial Rule 52(A)). We review the trial court's legal conclusions de novo. *Id.* at 217. Here, Kite generally accepts the trial court's findings,[1] and argues only that the trial court misapplied the law. Thus, our review is de novo. *See id.*

### I. The Statutory Scheme Permits Post-Election Challenges to the Eligibility of a Candidate

Kite first argues that the trial court erred by concluding that he could not challenge Curlin's eligibility after the election. Kite correctly notes that the applicable statutory scheme clearly permits such post-election challenges. Specifically, Indiana Code chapter 3-12-8 contains several provisions setting

---

[1] In a footnote to his brief, Kite argues that the trial court clearly erred in concluding that he "'in the alternative ignored investigating his opponent Curlin's residency' and waited to see who won at the polls and then sought to essentially set the election aside." Appellant's Br. at 13 (quoting Appellant's App. p. 11). Kite, however, does not argue that this allegedly erroneous conclusion requires reversal.

forth the procedure for post-election challenges to a school board member's eligibility.

[9] The first section of this chapter provides that, subject to exceptions not applicable here,[2] "[a]ny candidate for nomination or election to a local or school board office may contest the nomination or election of a candidate who is declared nominated or elected to the office." Ind. Code § 3-12-8-1(b). The second section of this chapter states that an election may be contested under section 1 if a petitioner alleges that one of the several circumstances exist, including that "the contestee was ineligible[.]" Ind. Code § 3-12-8-2. Such a contest must be filed in the local circuit court "no later than noon fourteen (14) days after election day." Ind. Code § 3-12-8-5. The petition to contest the election must state inter alia:

> (3) That the petitioner in good faith believes that one (1) or more of the following occurred:
>
>> (A) The person declared nominated or elected does not comply with a specific constitutional or statutory requirement set forth in the petition that is applicable to a candidate for the office. . . .

Ind. Code § 3-12-8-6(a).

---

[2] These exceptions apply to a candidate who (1) receives the most votes in a primary election; and (2) is certified as deceased. Ind. Code § 3-12-8-1(b).

[10] Once the relevant parties and the local election board have been served, Ind. Code § 3-12-8-8, and the candidate challenged in the petition files an answer, Ind. Code § 3-12-8-10, the trial court must hold a hearing on the petition. Ind. Code § 3-12-8-17. If the trial court determines that the contestee is ineligible, then the court "shall declare as elected or nominated the qualified candidate who received the highest number of votes and render judgment accordingly." *Id.* at § 17(c). If the trial court declares the winning candidate is ineligible and that the eligible candidate who received the most votes is therefore elected, it must certify its determination to the county election board and if applicable, the election division and governor. Ind. Code § 3-12-8-18. If the challenger is successful, the person then in possession of the office "shall vacate the office" upon "demand of a person receiving a . . . certificate of election issued following the certification under section 18[.]" Ind. Code § 3-12-8-21. It is therefore clear that Indiana Code chapter 3-12-8 permits a post-election contest to the eligibility of a candidate who won the office.

## II. Curlin Was Not an Eligible Candidate for the District 2 Seat to Which She was Elected

[11] Kite also correctly notes that Curlin was not an eligible candidate for the District 2 seat to which she was ultimately elected. The trial court did not find otherwise. Indeed, it is undisputed that Curlin did not reside in District 2. Nor is there any evidence that she moved or planned to move into District 2. Indiana Code section 3-8-1-34(b) clearly provides that, for "a candidate for school board office seeking to represent an election district that consists of less

than the entire school corporation," "[t]he candidate **must** have resided in the election district for at least one (1) year before the election." (emphasis added). The 2015 Plan adopted by MSDWT incorporated this requirement by stating that a candidate for a seat representing a residence district must have lived in that district "for a period of time in excess of one (1) year prior to the date of the general election on which the candidate's name appears on the ballot for election[.]" Ex. Vol., Joint Ex. 1 pp. 3–4. Thus, Curlin was clearly ineligible for the District 2 seat on the School Board.

[12]    We further note that MSDWT's 2015 Plan provides that

> Three (3) of the five (5) Board Members must reside within and run for a board position from those three geographically limited residence districts **with one member elected from each such residence district**. The other two (2) Board Member positions will be elected from the at-large district comprising of the entire territory of MSDWT, provided, however, both of the at-large seat Board Members may not reside within the same geographically limited residence district.

*Id*. at 3 (emphases added). Thus, the 2015 Plan provides for geographic diversity among the members of the School Board.

[13]    This provision of the 2015 Plan mirrors similar provisions meant to ensure geographic diversity among school board members that are set forth in the applicable statutes. Indiana Code section 20-23-4-27(b) provides that an elected school board shall be elected in accordance with one of six methods set forth in Subsection 27(c). The method chosen by MSDWT is that listed in Subsection

27(c)(3): dividing the school corporation into three residence districts of approximately equal population. *See* Ind. Code § 20-23-4-27(c)(3); Ex. Vol, Joint Ex. 1. If the school board consists of five members, as the MSDWT School Board does, then no more than two members may reside in any one residence district. Ind. Code § 20-23-4-27(c)(3)(B).[3]

[14] Here, the trial court found, and the parties do not dispute, that the School Board consists of five members, two of whom are elected as at-large candidates, and the other three from the three residential districts. District 1 is represented by Wanda Thurston, who resides in District 1 and was re-elected in 2016; District 3 is represented by Tony Dzwonar, who resides in District 3 and was re-elected in 2016; one at-large seat is held by Bill Turner, who was re-elected in 2018 and resides in residence District 1, and the other at-large seat is held by John Fencl, who was elected in 2016 and resides in District 3. As Curlin lives in District 1, there are currently three members of the School Board who reside in District 1 and none who live in District 2, contrary to the legislative intent favoring geographic diversity on school boards.

---

[3] Literally, Subsection 27(c)(3)(B) provides that, if a three-district school board consists of five members, then "two (2) members may not reside in any one (1) residence district." This is an obvious drafting error. If a school board has five members and three geographical residence districts, with three members elected from the residence districts and two at-large members, then two members *must*, by mathematical necessity, reside in one residence district. "We are required to determine and effect the legislative intent underlying the statute and to construe the statute in such a way as to prevent absurdity and hardship and to favor public convenience." *Livingston v. Fast Cash USA, Inc.*, 753 N.E.2d 572, 575 (Ind. 2001). Here, the legislative intent for geographic diversity is obvious. We therefore construe Subsection 27(c)(3)(B) to mean that, if a school corporation is divided into three residence districts and has a five-member school board, then *no more than two members* may reside in any one residence district.

[15] We additionally note that Indiana Code section 20-23-4-29.1(e) states that, if a school corporation plan provides that all members of the school board are to be elected by all the voters in the corporation, then the candidates shall be placed on the ballot by residence district. "The ballot must state the number of members to be voted on and the maximum number of members that may be elected from each residence district as provided in the plan." *Id.* Generally, "[t]he candidates who receive the most votes are elected." *Id.* If, however, "more than the maximum number [of candidates] that may be elected from a residence district are among those receiving the most votes, the candidates from the residence districts exceeding the maximum number who receive the fewest votes shall be eliminated in determining the candidates who are elected."[4] *Id.*

[16] Thus, our General Assembly has expressed its intention to prioritize the geographic diversity of the composition of a school board over seating the candidate who received the most votes if the election of a candidate dilutes or destroys the geographic diversity of the board. Yet, with Curlin on the MSDWT School Board, there are now three of five members who reside in District 1: Thurston, Turner, and Curlin, who, contrary to the clear statutory eligibility requirement that a candidate for the District 2 seat reside in District 2, resides instead in District 1. This leaves the School Board without the

---

[4] This last provision was added in apparent response to our opinion in *Campbell v. Board of School Commissioners of the City of Indianapolis*, 908 N.E.2d 1234, 1240 (Ind. Ct. App. 2009), in which we held that a statutory provision that defined the winning candidate for school board as the one who received the most votes controlled over a conflicting provision that prohibited two members residing in the same residential district.

geographic diversity required by the 2015 Plan and clearly intended by the General Assembly.

[17] Again, the trial court did not conclude that Curlin was eligible to hold the seat representing District 2. The outcome of this case would therefore seem to be simple: Curlin was an ineligible candidate due to her residency in District 1, and Kite brought a statutorily authorized post-election challenge to her eligibility wherein it was clearly established that Curlin was an ineligible candidate. The trial court, however, concluded that it could not unseat Curlin despite her ineligibility based on controlling precedent from our supreme court. We therefore turn our attention to this precedent.

### III. Precedent Disfavors Post-Election Disenfranchisement

[18] Our supreme court has held that Indiana law strongly disfavors "post-hoc disenfranchisement of voters," writing:

> The Indiana Constitution guarantees that "[a]ll elections shall be free and equal." Ind. Const. art. 2, § 1. Consistent with this guarantee, this Court has always been wary of overturning the will of the voters who have freely and willingly cast their ballots. *See, e.g., Burke v. Bennett*, 907 N.E.2d 529 (Ind. 2009) ("This application of the Indiana disqualification statute is consistent with the longstanding respect for the right of the people to free and equal elections . . . and the reluctance of this Court to remove from office a person duly elected by the voters."). We liberally construe the statutes governing post-election contests "'**in order that the will of the people in the choice of public officers may not be defeated by any merely formal or technical objections**.'" *Pabey v. Pastrick*, 816 N.E.2d 1138, 1148 (Ind. 2004)

(quoting *Tombaugh v. Grogg*, 146 Ind. 99, 103, 44 N.E. 994, 995 (1896)).

Even where facts are alleged that might if later proven render a candidate ineligible, "[t]he existence of the fact which disqualifies, and of the law which makes that fact operate to disqualify, must be brought home so closely and so clearly to the knowledge or notice of the elector, as that to give his vote therewith indicates an intent to waste it." *Oviatt v. Behme*, 238 Ind. 69, 74, 147 N.E.2d 897, 900 (1958) (quoting *People ex rel. Furman v. Clute*, 50 N.Y. 451 (1872)). Those voters who are lawfully qualified to participate in our democratic process "may not be disenfranchised except by their own willful or deliberate act to the extent that one who did not receive the highest vote cast may still be declared elected." *Id.* at 74–75, 147 N.E.2d at 900.

*White v. Indiana Democratic Party ex rel. Parker*, 963 N.E.2d 481, 486 (Ind. 2012) (emphasis added).

[19]  Relying on the above-emphasized language, the trial court determined that Curlin's ineligibility for the District 2 seat was merely a "technical" issue and that unseating Curlin would improperly disenfranchise the electorate who voted for Curlin. We agree with Kite that the question of whether a candidate is ineligible for office due to her failure to meet a residency requirement is not a mere formal or technical objection.

[20]  As discussed *infra* in more detail, the *White* court cited this "technicality" language in addressing a challenge to a candidate's residency, but the court ultimately held that the candidate, at the time of the post-election challenge, was eligible. Thus, *White* did not hold that a candidate's ineligibility based on

residency was a formal or technical objection. 963 N.E.2d at 488. And in the case cited in *White* in support of this proposition, the issue was not one of the eligibility of a candidate. *See Pabey*, 816 N.E.2d at 1149 (considering whether there had been deliberate acts that made it impossible to determine the candidate who received the highest number of votes). In contrast, the cases cited in *Pabey* did deal with technical, procedural objections. *See Tombaugh*, 146 Ind. 99, 44 N.E. at 995 (rejecting appellee's argument that board of commissioners did not have jurisdiction because it failed to meet at the time fixed by the auditor); *see also Hadley v. Gutridge*, 58 Ind. 302, 309 (1877) (addressing appellee's argument that service of process was insufficient).

[21]    Our research has revealed no Indiana case that has held that a candidate's residency, as it pertains to his or her eligibility for office, is a "mere technicality." Instead, we agree with the Supreme Court of Kansas that, given "the importance of geographical representation on school boards, expressed through the complex scheme for school board makeup precisely set forth in the statutes," "[d]isqualification by nonresidency, continuing and not corrected at any stage by the candidate," is not a technical irregularity. *In re Massey*, 605 P.2d 147, 150 (Kan. 1980). Instead, here, residency is a fundamental eligibility requirement to hold the office.

[22]    Unlike the trial court, we do not think that a contrary result is mandated by *White*. In that case, the challenged candidate, Charlie White, ran for and was eventually elected to the office of Indiana Secretary of State as a member of the Indiana Republican Party. After White was elected to this office, the chairman

of the Indiana Democratic Party filed a petition with the Indiana Recount Commission, seeking to contest the results of White's election, alleging that White was not qualified to assume the office of Secretary of State because he was not registered to vote at the address where he resided as of July 15, 2010—the deadline for the Republican Party to file its certificate of nomination—in accordance with the applicable statute. The Recount Commission determined that White was eligible, but the trial court reversed and ordered the Commission to declare White's opponent as the Secretary of State. The Commission and White appealed, and our supreme court granted transfer of jurisdiction to that court.

[23] The *White* court noted that the Democratic Party could not have brought its claim in the period after the May 2010 primary election because several months remained before the expiration of the period for White to comply with the statutory residency requirement. 963 N.E.2d at 487. The question before the court was therefore whether the challenge to White's eligibility was permissible under the post-election challenge statute or whether it was untimely because it could have been brought earlier under the pre-election challenge statutes. *Id.*

[24] The *White* court held that the language of the statutes at issue spoke in the present tense, which suggested that a claim to the eligibility of a candidate must be "analyzed at the time that the [challenge] is brought." *Id.* at 488 (citing Ind. Code § 3-12-11-3(b)(4)(A) (permitting a post-election challenge to a winning candidate if the winner "does not comply with a specific constitutional or statutory requirement set forth in the petition that is applicable to a candidate

for the office."). The Democratic Party sought to read the statute as permitting a challenge when the challenged candidate "*did not*" comply. *Id.* The *White* court noted, however, that unlike other sections regarding a challenge to a candidate's eligibility, this subsection "was not written to encompass a past-tense violation—only a current and ongoing one." *Id.* (citing Ind. Code §§ 3-12-11-3(b)(4)(B) ("A mistake *was made*"), -3(b)(4)(C) ("A mistake *occurred*"), -3(b)(4)(D) ("An electronic voting system *malfunctioned*"), -3(b)(4)(E) ("A deliberate act or series of actions *occurred*")). *Id.* at 488–89.

[25] The statutory eligibility requirement at issue in *White* was concerned with the *current* status of the candidate, providing that "'[a] person *is not qualified* to run ... unless the person *is registered* to vote in the election district the person seeks to represent.'" *Id.* at 489 (quoting Ind. Code § 3-8-1-1(b)). This contrasted with other disqualifying provisions aimed at past conduct. *Id.* (citing Ind. Code § 3-8-1-5(c)(1) (disqualification if "the person gave or offered a bribe, threat, or reward to procure the person's election"), -5(c)(3) (disqualification for felony convictions), -5(c)(4) (disqualification if "the person has been removed" from office)).

[26] Accordingly, the *White* court held that, "when the challenge was filed post-election[,] White *was* correctly registered at his place of residence—[his] condo—in the election district he sought to represent—i.e., the State of Indiana." *Id.* (emphasis in original). The court further observed that the statutes governing pre-election filings provide for an express procedure through which a voter may challenge the validity of those filings within the time limits for pre-

election challenges. *Id.* (citing Ind. Code § 3-8-1-2 (2005)). None of White's filings were confidential or sealed, and the discrepancy at issue was discovered by a private citizen. *Id.* The court therefore concluded that "the exercise of more due diligence by the Democratic Party might have made a pre-election challenge possible." *Id.*

[27] The *White* court noted that its holding placed a burden on political campaigns to investigate and vet opponents before the pre-election challenge time limits expire, but concluded that this was "better than the alternative: that a challenger might ignore a known (or knowable) disqualification challenge before the election, wait to see who won at the polls, and then seek to set aside the results of the democratic process. Such a result is inconsistent with free elections and respect for voters' expressed preferences." *Id.* Because the allegations regarding White's qualifications arose before the election and were made public, the court concluded that it was "likely that the average voter was aware that there were concerns about White's voter registration history at the time of the election, but we will not, on the basis of the present petition, judicially disenfranchise voters who went to the polls aware of what were at that moment only allegations." *Id.* at 490.

[28] In support of its holding, the *White* court relied on *Burke v. Bennett*, 907 N.E.2d 529 (Ind. 2009). That case involved a post-election challenge alleging that the winning candidate for the office of mayor of Terre Haute, Indiana could not assume the office because his prior job was connected with activities financed in part by the federal government, which is forbidden under the federal "Little

Hatch Act," and also acts as a disqualification under the Indiana election statutes. *Id.* at 530–31 (citing 5 U.S.C. § 1502; Ind. Code § 3-8-1-5(c)(6)). At the time the winning candidate assumed office, however, he was no longer employed in his prior position. *Id.* at 532. The trial court rejected the challenge, and on transfer to our supreme court, the court affirmed. *Id.* at 533.

[29] The *Burke* court held that a disqualification challenge for a Little Hatch Act violation could properly be brought before or after the election—but "[t]he point in time at which the statute's disqualifiers are to be assessed depends upon whether the challenger is using the statute to prevent another person from being a candidate or from assuming office." *Id.* at 532. Regardless of whether there was a pre-election challenge or a post-election challenge, the language of the disqualification provisions at issue in *Burke* "focuse[d] on current or prospective status as the basis for disqualification," whereas "several of the statute's other provisions clearly refer[red] to a person's past conduct as grounds for disqualification." *Id.* Thus, the winner's change in employment after assuming office was dispositive. *Id.*

[30] The *Burke* court viewed the question not as "whether a successful candidate *was* subject to the [Little Hatch] Act or *had been* in violation of it when the candidate became or remained a candidate, but "whether the election winner *is* subject to the Act and whether he *would* violate it by *becoming or remaining* a candidate." *Id.* (emphasis in original). Because this question necessarily required proof that a person "would, in the future, violate the Act by becoming or remaining a candidate," the *Burke* court held that "this disqualifier is inapplicable to

establish ineligibility in a post-campaign election contest" because from the time the challenge was filed until the date of assumption of office, the defendant was no longer a candidate. *Id.* From the undisputed facts of that case, it was simply impossible to find that the winner "*is* subject to" and "*would* violate" the Little Hatch Act by "becoming or remaining" a candidate. *Id.* (emphasis in original). The *Burke* court acknowledged that its holding would restrain application of the Little Hatch Act in post-election contests, but not in pre-election challenges. *Id.*

[31] The trial court here, citing *White*, concluded that because Curlin's ineligibility was discoverable prior to the election, a post-election challenge was untimely. Although there is language in *White* supporting this conclusion, and we understand why the trial court relied thereon, we believe that the facts of *White*, and the facts of *Burke* on which the *White* court relied, are distinguishable from the facts of the present case.

[32] As set forth above, in both *White* and *Burke*, the disqualifications at issue had ceased to exist by the time the winning candidate had been elected and assumed office. Curlin, in contrast, was and *continues to be* ineligible for the office she now holds. We do not read *White* or *Burke* as prohibiting a post-election challenge to the *continued* ineligibility of a candidate simply because the ineligibility could have been discovered prior to the election.

[33] Certainly, it would have been preferable if Curlin had realized her ineligibility by looking at what are rather straight-forward descriptions and maps showing

that Curlin clearly did not and does not live in District 2. Had Curlin not made such a fundamental mistake, we would not be faced with the current controversy. Of course, as noted by the trial court, the same is true of Kite, who could have easily looked at Curlin's address in her publicly available election filings, compared this with the relatively clear district map, and discovered that Curlin was ineligible. Had he done so, he could have made a pre-election challenge to Curlin's candidacy. Indeed, neither party, both of whom are attorneys, did what they should have done.

[34] But despite our strong disinclination to overturn the results of an election after the fact, Curlin, unlike the candidates in *White* and *Burke,* remains statutorily ineligible for the seat that she currently holds. To hold that Kite cannot now challenge Curlin's current eligibility would be to effectively read the post-election challenge statutes out of the Indiana Code. We do not believe this was the intent of our supreme court in *White* or *Burke*, where the disqualifications were not continuing.

## Conclusion

[35] It is undisputed that Curlin does not reside in District 2. Nevertheless, Curlin ran for, and was elected to a seat on the School Board representing District 2. Under the applicable statutes, she is ineligible to hold the seat she currently holds. This ineligibility, although discoverable prior to the election, was not discovered until after the election. Although Indiana law disfavors post-election removal of candidates who were chosen by the voters, we are unable to overlook the fact that, unlike the candidates in *Burke* and *White,* Curlin remains

ineligible for the seat she holds. Accordingly, we reverse the trial court's judgment and remand for proceedings consistent with this opinion.

[36] Reversed and remanded.

Robb, J., and Pyle, J., concur.